UNITED STATES of America, Appellee,

v.

Alfred M. LAWSON, Appellant.

No. 81–5103.

United States Court of Appeals,
Fourth Circuit.

Argued April 2, 1982.

Decided June 24, 1982.

Rehearing Denied Aug. 6, 1982.

Certiorari Denied Nov. 8, 1982.
See 103 S.Ct. 348.

Martha F. Rasin, Annapolis, Md. (Bruce C. Bereano, Annapolis, Md., on brief), for appellant.

Robert N. McDonald, Asst. U. S. Atty., Baltimore, Md. (J. Frederick Motz, U. S. Atty., David B. Irwin, Asst. U. S. Atty., Baltimore, Md., on brief), for appellee.

Before BUTZNER, RUSSELL and HALL, Circuit Judges.

K. K. HALL, Circuit Judge:

Lawson, a registered pharmacist, was convicted on nineteen counts of violating

the federal narcotics laws, 21 U.S.C. §§ 841(a)(1) and 846, including one count of conspiracy to distribute Schedule II substances and eighteen counts of distribution of Schedule II drugs on the basis of prescriptions which he knew were not issued for a legitimate medical purpose. He appeals, alleging that there was insufficient evidence to convict him on the distribution counts or to connect the various distribution charges into a single conspiracy. A review of the evidence reveals that there is no merit to this appeal and accordingly, we affirm.

## I.

In 1976, Ronald Smith, an obese man, began an illicit prescription arrangement with Dr. Possinger, a Philadelphia osteopath who ran a "diet clinic." Possinger would make records for fictitious patients and sell their "prescriptions" to Smith. The prescriptions were for preludin, a stimulant used for weight control, and tuinal, a sedative hypnotic also used in diet programs to counteract the effects of preludin.[1] All the prescriptions were alike, and Possinger would sell Smith as many as fifteen per day for $10–15 a piece. Smith's only chore was to find a pharmacist to fill the prescriptions.

Lawson was part owner of two pharmacies, one in Ocean City, Maryland, a resort community a few hours from Philadelphia, and the other in Hyattsville, Maryland, a suburb of Washington, D. C. Lawson himself worked full time at the Ocean City pharmacy, filling in one weekend a month for Thomas Lane, the manager of the Hyattsville store.

Late in 1976, Smith started presenting his bogus prescriptions at Lawson's Ocean City pharmacy. At first, Lawson called Dr. Pos-

singer a few times to verify them. On a couple of occasions, Lawson took the additional precaution of contacting the federal drug task force in Philadelphia to see if Possinger himself was legitimate. The drug enforcement agents told Lawson that Possinger had a poor reputation and Lawson should be guided by his conscience in deciding whether or not to fill the prescriptions.[2]

Lawson decided to fill the orders. Because the pharmacy did not stock these drugs in quantity, Lawson would order large amounts from wholesalers and fill the prescriptions when the drugs arrived; Smith would return to pick them up.

The volume of drugs Lawson was ordering prompted the Drug Enforcement Administration to investigate.[3] When the investigators were questioning Lawson, he indicated that all of Possinger's patients were coming to Ocean City to get their diet pills; he said nothing about Possinger's "diet clinic" or Smith. He also maintained at that time that he had called Possinger to verify every new patient, although in fact his telephone records reflected only four calls to Philadelphia.

In all, over a five-month period, Smith brought 495 preludin prescriptions and 250 tuinal prescriptions to the Ocean City pharmacy. After receiving two grand jury subpoenas for Possinger's prescriptions, Lawson stopped filling them.

In late 1977, Smith reappeared, this time at the Hyattsville pharmacy with prescriptions for dilaudid, a Schedule II controlled drug used for severe pain. These prescriptions were from Dr. Nickerson, a Washington, D. C., physician, issued to various fictitious patients. Because Lawson was at the Hyattsville pharmacy only once a

---

1. Both of these drugs are Schedule II controlled substances. 21 U.S.C. § 812. Drug addicts take them simultaneously to achieve a "paradoxical high."

2. Neither Lawson nor the agents were completely candid in their communications. Lawson did not make it clear that Smith was bringing in prescriptions for thirty to fifty of Dr. Possinger's "patients" at a time. On the

agents' parts, they did not inform Lawson that Possinger was under investigation and had been convicted on state drug violations the previous spring.

3. Pharmacies must order Schedule II drugs using special three-part forms. One copy is sent to the Drug Enforcement Administration so it can monitor large purchases of drugs.

month, Lane, the pharmacist and manager of the Hyattsville store, filled the majority of these prescriptions. However, Lawson filled a number of the dilaudid prescriptions at the Ocean City pharmacy.

As before, Smith would drop off the prescriptions, the dilaudid would be ordered from the wholesaler, frequently by Lawson, and Smith would return to pick up the drugs when they arrived. There was often a substantial time lapse before the prescriptions could be filled.

On one occasion, Lawson was in the Hyattsville store when Smith came in and they greeted each other. Smith left without presenting any prescriptions or picking up any drugs and Lawson did not caution Lane or the other pharmacists about him. On another occasion, Lawson came into the Hyattsville store and handed Lane a bulging envelope like the ones he normally delivered prescriptions in, saying he had had a visit from "Ron."

Smith was able to have his dilaudid prescriptions filled at the Hyattsville pharmacy through February of 1979, when the police closed in. In June, 1980, Lawson, Lane, and Smith were each indicted on one count of conspiracy to distribute Schedule II substances and twenty-one counts of distributing controlled substances, including seven counts of distributing preludin and tuinal out of the Ocean City pharmacy and fourteen counts of distributing dilaudid out of the Hyattsville pharmacy. Lawson was convicted on all but three of the dilaudid counts.[4]

## II.

Lawson challenges the sufficiency of the evidence to support the convictions on the distribution counts. In particular, he claims, the government failed to prove that he knew the prescriptions were not legitimate.

Controlled substances may be dispensed only when prescribed by a licensed practitioner. 21 U.S.C. § 829. Furthermore,

[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of . . . (21 U.S.C. § 829) and the person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances. 21 C.F.R. § 1306.04(a).

The question, then, in any case where a pharmacist is charged with illegal distribution of controlled substances, is whether he knew that the purported prescription was not issued for a legitimate medical purpose or in the usual course of medical practice. *United States v. Hayes*, 595 F.2d 258, 260 (5th Cir.) *cert. denied* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 89 (1979). The key element of knowledge may be shown by proof that the defendant deliberately closed his eyes to the true nature of the prescription. *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980) *cert. denied* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1981); *United States v. Kershman*, 555 F.2d 198, 200 (8th Cir.) *cert. denied*, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977). There is abundant evidence in this case from which the jury could conclude that Lawson knew the prescriptions Smith presented were bogus.[5]

When a pharmacist is faced with a large number of prescriptions all written by one doctor and all presented by one person, he has strong evidence that the prescriptions are not legitimate. *United States v. Hayes, supra.* Further, as the government's expert, Donald Fedder, a professor of pharmacy at the University of Maryland testified, the uniform dosages and quanti-

---

4. Lane was convicted on the conspiracy and dilaudid counts. He died several days after the verdict was entered.

5. The jury's verdict must be affirmed if there is sufficient evidence, viewed in the light most favorable to the government, from which any rational jury could have found guilt beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Steed*, 674 F.2d 284, 286 (4th Cir. 1982).

ties belied any conclusion that the prescriptions in this case were ordered for individual patients.[6]

There are other factors which demonstrate Lawson's knowledge. Tuinal and preludin are prescribed together in a diet program, so it is highly suspect that none of Dr. Possinger's "patients" received both drugs. The diluadid prescriptions were even more questionable. While tuinal and preludin could arguably be used for a number of patients in a diet clinic, diluadid is prescribed only for persons experiencing excruciating pain. If a doctor were operating a clinic for terminal cancer patients, perhaps he would prescribe diluadid regularly. However, if that were the case, the patients would need their prescriptions filled immediately; they would be unable to wait days, weeks, or even months while the pharmacy ordered the drugs from a wholesaler as was done here. Further, even assuming that Lawson would have seen nothing amiss in the diluadid prescriptions he filled himself, he should have been alerted by the surge in the quantity of diluadid he was ordering from the wholesaler for the Hyattsville pharmacy.

There is other evidence from which a jury could infer Lawson's actual knowledge that the prescriptions were not valid. Having verified the first few batches of Possinger prescriptions, he stopped questioning their legitimacy. When the inspectors asked him about the preludin and tuinal prescriptions, he lied, saying that all Possinger's patients were coming to Ocean City to fill their prescriptions. In addition, the grand jury's investigation into the Possinger prescriptions alerted Lawson to the likelihood that Smith might be passing fake prescriptions. Yet, he showed no alarm when he saw Smith in the Hyattsville pharmacy a year

later; he never asked why Smith, whom he supposedly knew as a Philadelphia resident, would be browsing in a Washington, D.C. area pharmacy; and he never conveyed any concern to the pharmacists at the Hyattsville store. Later, Lawson came to the Hyattsville store with a bulging envelope, which was markedly similar to ones he generally used to carry prescriptions, and handed it to Lane, saying that he had been visited by "Ron," an obvious reference to Ronald Smith.

In sum, Lawson willingly ignored every signal that he should question the volume of controlled drugs being dispensed from his pharmacies. Moreover, there is the evidence that, beyond suspicion, he knew the prescriptions were not legitimate.

### III.

■ Lawson also argues that the government failed to prove a single, overall conspiracy as was charged. Rather, he contends, the government was permitted to prove a series of preludin-tuinal prescription charges separately from a series of diluadid charges, only to bring them all together at the end under a single conspiracy umbrella.

The issue became more complicated when the judge originally instructed the jury that it could find a single conspiracy even if one of the defendants had conspired separately with Smith or the doctors. The judge struck that instruction *sua sponte*[7] and told the jury instead that they must find a single conspiracy as charged. Despite any interim confusion, the trial judge left the jury with a clear instruction that to convict they must find a single conspiracy.

Lawson contends, nonetheless, that the verdict on the conspiracy count is invalid because he was not convicted on all of the

---

**6.** Lawson argues that Professor Fedder should not have been qualified to testify about the medical legitimacy of the prescriptions because the pharmacists, and not the doctors, were on trial. Admittedly, the only issue is whether the pharmacist knew the prescriptions were not genuine. However, contrary to the defendant's arguments, Dr. Fedder's testimony did not stray from that issue. Although Professor Fedder was asked if, in his opinion, the prescrip-

tions were issued for a legitimate medical purpose, he answered from a pharmacist's perspective, pointing to the flags of illegitimacy (such as the uniformity of the prescriptions) which should signal a pharmacist that the prescriptions were not legitimate.

**7.** It is worthy of note that the defendants did not object to the instruction.

substantive counts. Lawson was acquitted on three of the dilaudid counts, but that does not prove his point. First, it is axiomatic that consistency of verdicts is not required. *Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974). Moreover, Lawson was convicted on the majority of substantive counts, including the dilaudid counts; thus, he and Smith could be viewed as the principals in an ongoing conspiracy involving first the preludin and tuinal prescriptions filled at the Ocean City pharmacy and later the dilaudid prescriptions filled at the Hyattsville pharmacy.[8]

## IV.

We have considered the other issues Lawson raises on this appeal and find them to be without merit. Accordingly, we affirm the conviction.

AFFIRMED.

---

**8.** *See, e.g., United States v. Diana*, 605 F.2d 1307 (4th Cir. 1979), *cert. denied* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *United States v. Calabro*, 467 F.2d 973 (2d Cir. 1972) *cert. denied Tortorello v. United States*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973).

*Compare United States v. Coward*, 630 F.2d 229 (4th Cir. 1980), on rehearing, 669 F.2d 180 (4th Cir. 1982), (two pharmacists conspired with the same doctor, but were otherwise totally unconnected).