**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles HUGHES (88–1658), Luckett Larry (88–1659), Sanford Hoskow (88–1660), Basem Kandah (88–1661), and Dale Dudley (88–1751), Defendants–Appellants.**

Nos. 88–1658, 88–1659, 88–1660, 88–1661 and 88–1751.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 30, 1989.

Decided Feb. 12, 1990.

Thomas A. Ziolowski, Asst. U.S. Atty., Wayne F. Pratt (argued), Office of the U.S. Atty., Detroit, Mich., for U.S.

James R. Andary, Andary, Brennan & Andary, Detroit, Mich., for Charles Hughes.

David I. Goldstein (argued), Ann Arbor, Mich., for Luckett Larry.

Howard J. Wittenberg (argued), Andary, Brennan & Andary, Detroit, Mich., for Sanford Hoskow.

Edward Wishnow (argued), Southfield, Mich., for Basem Kandah.

Kenneth M. Mogill (argued), Mogill, Posner & Cohen, Detroit, Mich., for Dale Dudley.

Before KEITH, JONES and BOGGS, Circuit Judges.

KEITH, Circuit Judge.

Hubbell Medical Clinic ("HMC") was a disreputable medical clinic in Detroit that defrauded Medicaid and Blue Cross Blue Shield of Michigan through a scheme involving fraudulent blood testing and the illegal distribution of controlled substances. On March 22, 1988, after a six week trial before Judge Julian Abele Cook, a jury convicted Sanford Hoskow ("Hoskow"), Dale Dudley ("Dudley"), Luckett Larry ("Larry"), Charles Hughes ("Hughes") and Basem Kandah ("Kandah") (collectively "defendants") for their respective roles in the operation of HMC.[1] Defendants appeal their convictions. For the reasons set forth below, we AFFIRM.

## I.

HMC opened in August 1985. The patients were drug addicts who came to the clinic to obtain Schedule III drugs.[2] One of two physician's assistants attended the patients. Under the policy established by Linda Fisher ("Fisher"),[3] four tubes of blood were drawn from each new patient to conduct a "comprehensive" blood profile test. Patients who refused to give blood were denied controlled substances. The controlled substance prescriptions were telephoned to a cooperating pharmacy[4] where the patient purchased the drugs.

---

1. A total of 25 defendants were indicted on a total of 52 counts. Several co-defendants pled guilty and received sentences ranging from 15 years to probation. The case went to trial against the five appealing defendants and two corporate defendants. The case against Sunshine Pharmacy was dismissed due to its defunct status. Corporate defendant Superior Bio–Medical Laboratory, Inc. ("Superior") was convicted on the same counts as its owner, Luckett Larry. Superior received a $25,000 fine and did not appeal its conviction.

2. 21 U.S.C. § 812(b)(3) defines a Schedule III drug as one that has a currently accepted medical use, however, abuse of the drug "may lead to

moderate or low physical dependence or high psychological dependence."

3. Linda Fisher pled guilty and agreed to testify against her co-defendants at trial. She received a 15–year prison sentence for her role in the HMC.

4. The arrangement at East Pharmacy is an example of the relationship between HMC and cooperating pharmacies. Fisher and Carl Scott ("Scott") agreed that East Pharmacy would receive prescriptions from HMC. As planned, Schedule II drugs were not prescribed, since they might alert government investigators of the scam. However, other non-controlled drugs

The policy of taking blood from every new patient was necessary for HMC to make a profit. The "comprehensive" blood test allowed the blood lab to bill the patient's insurance company for the most money.[5] A portion of that money was illegally kicked back to HMC and used to operate the clinic, pay the employees and pay the other bills.

Defendants' involvement in the operation of HMC was manifested in several ways. Hoskow assisted Fisher in setting up HMC. He provided equipment, contacts with doctors, loans and kickbacks in exchange for the right to serve as a broker for the clinic's blood testing business. Hoskow was convicted of one count of the Racketeer Influenced and Corrupt Organization Act ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(d), one count of criminal RICO, in violation of 18 U.S.C. § 1962(c), and twelve counts of mail fraud, in violation of 18 U.S.C. § 1341. He was sentenced to a total of 17 years of imprisonment and fined $10,000. In addition, a $150 special assessment was imposed.

Dudley, a medical doctor, agreed to be a supervisory physician or "doctor of record" for $500 cash per week, in order to lend a facade of legitimacy to the medical practice at HMC. In fact, Dudley did not meaningfully supervise HMC's medical practice or obtain the required supervisory license. Instead, he directed the physician's assistants, who actually treated the patients, to provide the patients with the controlled substance of their choice. Dudley was found guilty of RICO conspiracy, in violation of 18 U.S.C. § 1962(d), two counts of unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), and 16 counts of mail fraud, in violation of 18 U.S.C. § 1341. Dudley was sentenced to a total of four years in prison and a two-year parole term. In addition, a $950 special assessment was imposed.

Larry owned and operated the blood testing lab, Superior Bio–Medical Lab, Inc. Through his company, Larry paid illegal kickbacks to HMC in exchange for receiving HMC's blood testing business. Larry was convicted of RICO conspiracy, in violation of 18 U.S.C. § 1962(d), two counts of mail fraud, in violation of 18 U.S.C. § 1342, and Medicaid fraud, in violation of 42 U.S.C. § 1396h. Larry was sentenced to 18 months in prison.

Hughes, a registered pharmacist, owned and operated Sunshine Pharmacy. He filled illegal prescriptions from HMC for codeine, a Schedule III controlled substance. He then fraudulently billed the patient's insurance company for the medication. Hughes was found guilty of RICO conspiracy, in violation of 18 U.S.C. § 1962(d), criminal RICO, in violation of 18 U.S.C. § 1962(c), five counts of mail fraud, in violation of 18 U.S.C. § 1342, and one count of unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1). Hughes was sentenced to three years in prison, and a special assessment of $400 was imposed.

Kandah, a registered pharmacist, worked at East Pharmacy for Carl Scott ("Scott"). Kandah, at Scott's direction, filled controlled substance prescriptions from HMC that he knew were outside the scope of legitimate medical practice. Kandah was convicted of one count of unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1). Kandah was sentenced to three years in prison and four years of parole. In addition, a special assessment of $50 was imposed.

## II.

On appeal, defendants raise a variety of issues. Dudley, Hughes, Kandah and Larry challenge the sufficiency of evidence to support the jury's verdict in their respective convictions. In addition, defendants challenge their respective convictions on

were prescribed to give the appearance of legitimate pharmacy operations. Additionally, East Pharmacy kicked back $.25 to $.50 per prescription to HMC in rent on a pharmacy space in HMC. East Pharmacy paid the rent, but never occupied the space.

5. Blood labs could bill Medicaid or Blue Cross Blue Shield of Michigan for up to $650 per patient with a profit of up to $350.

grounds that they raise separately. Dudley contends that the trial court abused its discretion in denying his motion for a separate trial and committed plain error by permitting a qualified medical expert to offer an impermissible opinion as to a legal conclusion. Hoskow asserts that the trial court abused its discretion by denying his motion for a mistrial because the government violated the court's order in limine. Hoskow also argues that permitting the jurors to use transcripts, that had been verified by the court, while listening to tape recorded conversations constituted an abuse of discretion. Hughes alleges that a licensed pharmacist in Michigan has no duty to determine the medical necessity of prescriptions ordered by a licensed physician; therefore, it is error to hold him criminally liable for distributing controlled substances outside the course of legitimate medical practice. Kandah contends that the trial court erred in quashing a subpoena requiring a government expert to produce pharmacy documents. We will begin by addressing those issues that defendants raise collectively, and then address the issues that defendants raise separately.

### A.

Hughes, Larry, Dudley and Hoskow claim that their RICO conspiracy convictions cannot stand because there is insufficient evidence to support the single conspiracy charged in the indictment. They contend that, at best, the government has shown two separate, parallel and possibly overlapping schemes, rather than the one unified scheme charged in the indictment. We find this argument meritless.

This court has a limited scope of review in appeals challenging the sufficiency of evidence. We must view the evidence in the light "most favorable to the govern-

ment." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Grunsfeld*, 558 F.2d 1231, 1238 (6th Cir.1977). We are bound to make all reasonable inferences and credibility choices in support of the jury's verdict. *United States v. Stull*, 743 F.2d 439, 442 (6th Cir.1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). Moreover, if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the convictions must be affirmed. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

██ Whether a single conspiracy or multiple conspiracies have been shown is a question of fact resolved by the jury. A conspirator need not have agreed to commit every crime within the scope of the conspiracy, so long as it is reasonable to infer that each crime was intended to further the enterprise's affairs. *See United States v. Sutton*, 642 F.2d 1001, 1017 (6th Cir.1980). Moreover, it is not necessary for each conspirator to participate in every phase of the criminal venture, provided there is assent to contribute to a common enterprise. *See United States v. Grassi*, 616 F.2d 1295, 1303 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980) ("Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership.").

The jury instructions explicitly required the jury to determine whether a single scheme existed as alleged in the indictment.[6] Defendants argued for acquittal based on the government's failure to prove the scheme charged in the indictment.

---

**6.** The jury instructions explained the following: In the indictment, it has been asserted by the Government that the different Defendants employed a single scheme to defraud Blue Cross Blue Shield and Medicaid. *To show participation in that scheme, the Government must prove beyond a reasonable doubt that a Defendant ... was a party to the same scheme which has been alleged in the indictment.* It is not sufficient if the Government proves that

a Defendant was a party to a scheme which was separate and distinct from that alleged in the indictment. In your consideration of the evidence in the case to the element of scheme or artifice to defraud charge, *you should first determine whether or not the scheme existed as alleged in the indictment.* Transcript vol. 24 at 133, *United States v. Hoskow et al.* (No. 85–80172) (emphasis added).

However, the jury rejected this argument, and we are in accord with the jury's finding.

■ There is sufficient evidence to sustain the jury's finding that defendants were involved in a single criminal venture with more than one phase of criminal activity.[7] We believe that a reasonable juror could find that the multiple criminal acts committed by defendants, which include the unlawful distribution of controlled substances, defrauding insurers and engaging in kickbacks, were elements of a single scheme. Thus reversal of defendants' convictions on this ground is unwarranted.

Having found that there is sufficient evidence to support the jury's finding that a single RICO conspiracy existed, we will address the argument, advanced by Dudley, Hughes and Larry, that insufficient evidence exists to sustain their convictions for participating in the RICO conspiracy. This argument is also unpersuasive.

■ When exercising appellate review of the sufficiency of the evidence to support a RICO conspiracy conviction, we must first determine if a conspiracy existed and then whether the defendant was a member of that conspiracy. *See United States v. Truglio,* 731 F.2d 1123, 1132 (4th Cir.), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984). Defendants' agreement to participate in the RICO conspiracy may be inferred from their acts. *United States v. Joseph,* 835 F.2d 1149, 1152 (6th Cir.1987) (inference drawn from defendant's acts is sufficient evidence of an agreement to participate in the affairs of the enterprise). Thus, for the RICO conspiracy counts, the government need not prove that each defendant personally committed two racketeering violations or overt acts in furtherance of the conspiracy.

■ Dudley maintains that as a "naive doctor" he knew nothing about the conspiratorial blood-for-drugs scheme. Duped and lied to by Fisher and Dr. Leon Butler, the physician he replaced at HMC, Dudley contends that he was not a willful member of the RICO conspiracy. Instead, he was erroneously convicted on a negligence standard.

The evidence belies Dudley's contentions. Dr. Butler warned Dudley that he would jeopardize his credentials if he accepted a position at HMC. Dudley was hired to be the doctor of record at HMC. However, instead of supervising the physician's assistants, he directed them to exercise their judgment. Dudley failed to obtain the required license to supervise the physician's assistants. He also neglected to file the required supervisory plan and written emergency treatment plan. Dr. Aaron Koenig, the government's medical expert, testified that the over-prescription of Tylenol with codeine and the over-use of comprehensive blood tests were so obvious that both infractions could be easily discovered upon review of the files. On at least two occasions, Dudley assured pharmacists that he was the doctor of record at HMC and his HMC telephone prescriptions should be filled. In addition, evidence obtained from a government wiretap indicated that Dudley was aware of the risks associated with his HMC affiliation.[8]

We are unpersuaded by Dudley's allegations of naivete. After reviewing the record, we find Dudley's contention that he was convicted on a negligence standard to be mere conjecture. The jury was instructed that they must find that Dudley specifically intended to participate in the illegal scheme. Because Dudley was a licensed physician, the jury could not find him guilty of distributing controlled substances, as long as he acted in "good faith." *Unit-*

---

7. The most salient evidence supporting the jury's finding of a single scheme is the interdependent relationship between the illegitimate prescription component of the operation and the fraudulent blood testing component. Without both components, the scheme would not have functioned.

8. The jury heard the following exchange:

KRAINER: See I really, I don't photograph very well and I, I don't want to have my picture in the papers.
DUDLEY: Oh, I don't either.
KRAINER: (Laughs).
FISHER: None of us do. (Laughs).
Government's Exhibit 18F at 5, *Hoskow et al.* (No. 85–80172).

ed States v. Moore, 423 U.S. 122, 140, 96 S.Ct. 335, 344, 46 L.Ed.2d 333 (1975) (physicians protected from criminal liability when dispensing controlled substances in the course of professional practice). There is substantial evidence to support Dudley's conviction on the RICO conspiracy count. Dudley's involvement at HMC invites the inference drawn by the jury—he *agreed* to participate in the RICO enterprise. Based on the evidence presented at trial, we conclude that a reasonable juror could have found the essential elements of the RICO conspiracy beyond a reasonable doubt.

Larry also contends that the evidence to support his RICO conspiracy conviction is insufficient. He claims that the corporations and individuals involved in this scheme did not manifest the formal structure required by a RICO enterprise. In addition, Larry argues that the government failed to establish that he agreed to participate in the RICO conspiracy. We find Larry's challenge meritless.

■ The definition of "enterprise" under 18 U.S.C. § 1961(4) includes "association in fact." We find that the record provides overwhelming evidence that the defendants and defendant corporations were associated in the scheme to provide Schedule III drugs in exchange for blood that could be subjected to comprehensive blood testing in order to defraud Medicaid and Blue Cross Blue Shield of Michigan.

■ At trial Larry testified that he was not a party to the agreement to participate in the enterprise, as he had no reason to believe that it was medically unnecessary to subject all of the new patients to comprehensive blood testing at $650 per test. However, taped telephone conversations revealed that Larry and Fisher agreed to the specific quota of tubes of blood sent to Larry at Superior Bio–Medical Laboratory, Inc. in exchange for a $60 kickback on every test. The quota established by Fisher and Larry indicates that Larry knew the blood tests were not medically necessary. Accordingly, the jury could reasonably infer that Larry agreed to pay kickbacks to HMC as an incentive to order unnecessary blood work. Therefore, we find Larry's allegation of insufficient evidence to support his RICO conspiracy conviction baseless.

■ Hughes challenges the sufficiency of the government's evidence to sustain his convictions for RICO conspiracy and substantive RICO. Regarding the RICO conspiracy offense, the jury was presented with an abundance of wiretap evidence and expert testimony by Gerald Bodendistal[9] from which it was reasonable to infer that Hughes had an agreement with Fisher and HMC to fill prescriptions that he knew were illegitimate. Thus, we find that Hughes' RICO conspiracy conviction must stand.

■ We are also unpersuaded by Hughes' allegation of insufficient evidence to sustain the criminal RICO offense. It was incumbent upon the government to establish the following elements of the criminal RICO offense: (1) that Hughes engaged in or conducted an enterprise; (2) that the enterprise affected interstate commerce; (3) that Hughes' conduct or participation in the enterprise was conducted through a pattern of racketeering activity; and (4) that the pattern of racketeering involved two or more instances of offenses set forth in the statute. 18 U.S.C. § 1962(c). *See Sedima, S.P.R.L. v. IMREX Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *United States v. Sutton*, 642 F.2d 1001, 1008 (6th Cir.

---

9. Gerald Bodendistal qualified as the government's pharmacy expert based on his past presidency of Michigan Pharmacists Association and service as an adjunct professor in the College of Pharmacy at Wayne State University, as well as his experience as a practicing pharmacist. He testified that it would not be within the usual course of pharmacy practice to meet with non-medical personnel and set up quotas of Tylenol 3 and Tylenol 4 to be dispensed per day, because the dosage prescribed and ultimately dispensed is determined by the patient's needs which would not be known in advance. He testified that based on his experience and training, it would be highly unusual in the course of pharmacy practice to dispense over 2,000 dosage units of Tylenol 3 and Tylenol 4 to patients from one clinic within a four-day period and over 20,000 dosage units within a 30–day period.

1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 995 (1981). Based on the record, a reasonable jury could find that the elements of a criminal RICO offense had been established.

 Hughes also challenges his mail fraud convictions on the ground of insufficient evidence. He argues that the government did not present any evidence of his intent to defraud. He maintains that the doctor who authorized the unnecessary prescriptions is the only person who can be held criminally liable for his insurance billings at Sunshine Pharmacy. We reject this argument.

By requesting reimbursement from the insurers, Hughes represented to them that the drugs were dispensed for legitimate medical purposes. However, as previously discussed, there is overwhelming evidence that Hughes: (1) knew that the drugs were not dispensed legitimately, and (2) caused the reimbursement checks to be mailed. For the foregoing reasons we find that Hughes' conviction on the mail fraud offense is supported by substantial evidence.

 Kandah's challenge to his conviction for unlawfully distributing controlled substances is based upon the insufficiency of the evidence. The evidence presented at trial established that the prescriptions issued by HMC were not issued in the course of legitimate medical practice. With respect to Kandah's challenge, the only issue remaining is whether there is substantial evidence to support the jury's finding that Kandah knowingly dispensed illegitimately prescribed controlled substances. We find that there is substantial evidence to support the jury's verdict.

The government presented evidence, consisting of taped conversations between Fisher and Kandah,[10] witness testimony, and Kandah's admission to an FBI agent, indicating that Kandah questioned both the volume and the high percentage of prescriptions for Tylenol with codeine. Gerald Bodendistal testified that it would be virtually impossible for a legitimate medical clinic to give out Tylenol with codeine to every patient.

Kandah filled most of the telephone prescriptions received at East Pharmacy. Over 90% of the patients from HMC received Tylenol 3. Consistent with the "good faith" practice of pharmacy, Kandah recognized the problems with HMC prescriptions and initially refused to fill them. The November 2, 1985 prescriptions, however, were filled after Kandah closed the pharmacy upon realizing that the prescriptions were illegal. Kandah's decision to re-open East Pharmacy and continue to fill prescriptions after realizing that they were not prescribed within the course of legitimate medical practice provides ample evidence to support his conviction for unlawful distribution of controlled substances.[11]

---

**10.** In a taped conversation that took place on October 17, 1985, Fisher asked Kandah not to get mad about the Tylenol 4's she was calling in. Kandah agreed to fill the prescriptions "if you don't tell anybody." Government's Exhibit 19C, Transcript vol. 16 at 25, *Hoskow et al.* (No. 85–80172).

**11.** Hughes raises a similar issue on appeal. He contends that as a licensed pharmacist, he was free to fill any facially valid prescription issued by a licensed physician. Therefore, it is error to hold him criminally liable for distributing controlled substances outside the course of legitimate medical practice. However, we reject Hughes' argument because of the substantial evidence indicating that he knew that the prescriptions were not issued in the usual course of medical practice.

21 U.S.C. § 841(a)(1) prohibits the distribution of controlled substances except as authorized by federal law. Pharmacists and physi-

cians are protected from liability when they dispense controlled substances in the course of professional practice. *United States v. Moore*, 423 U.S. 122, 140, 96 S.Ct. 335, 344, 46 L.Ed.2d 333 (1975). It is unlawful, however, for a pharmacist to fill a prescription which is not issued for a legitimate medical purpose. 21 C.F.R. § 1306.04 (providing, in pertinent part, "An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."). We adopt the reasoning of the Fourth Circuit in *United States v. Lawson*, 682 F.2d 480, 482 (4th Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 348, 74 L.Ed.2d 387 (1982) which held that where the government proves

B.

Dudley claims that the district court erred in denying his motion for a separate trial. We disagree with this contention and affirm the district court's ruling on this issue.

The district court's denial of Dudley's motion for severance will be overruled on appeal only if we find that the district court abused its discretion. *United States v. Bibby*, 752 F.2d 1116, 1123 (6th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986); *United States v. Licavoli*, 725 F.2d 1040, 1051 (6th Cir.), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984). Dudley has the burden of showing specific and compelling prejudice. However, Dudley fails to sustain his burden. Despite Dudley's claims that prejudicial spill-over evidence and the transference of guilt were largely responsible for his conviction, he does not cite a single piece of prejudicial evidence that would have been inadmissible in a separate trial. Dudley was charged with the fraudulent blood testing offenses that he contends produced the prejudicial evidence.[12] A separate trial would have had no effect on the government's presentation of evidence in its attempt to link him to the fraudulent blood testing component of the scheme.

Dudley argues that he was convicted for merely associating with Fisher. However, we find that it was the nature of his association with Fisher—a physician's exploitation of his medical license by lending a legitimate facade to the illegitimate operation of HMC—that the jury relied upon to reach its verdict. Thus, the district court did not abuse its discretion in denying Dudley's motion for a separate trial.

Dudley also challenges the decision of the district court to permit Dr. Aaron Koenig's testimony. Dr. Koenig, an expert witness for the government, testified that

Dudley and HMC were acting outside of the scope of legitimate medical practice by allowing physician's assistants to use Dudley's name to prescribe controlled substances and to order unnecessary blood tests. Dudley contends that the district court should not have permitted Dr. Koenig to testify to the state requirements for physicians who employ physician's assistants.

Since Dudley failed to object to Dr. Koenig's testimony at trial, we will apply the plain error standard of review to this issue. *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). Expert testimony is admissible in criminal cases to establish the "generally acceptable standards of medical practice for issuing prescriptions." *United States v. Kirk*, 584 F.2d 773, 785 (6th Cir.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 708 (1978).

Dr. Koenig testified that the State of Michigan requires physician's assistants to be licensed, sponsored by a doctor, and to work only under the supervision of a doctor. He testified that it would be improper for a doctor to delegate responsibility for prescribing controlled substances to a physician's assistant. Dr. Koenig specifically designated the following practices as inconsistent with legitimate medical practice: (1) adopting a policy that every patient could be given Tylenol 3; (2) drawing blood before the patient was examined in any way; (3) accepting kickbacks from a medical laboratory; (4) failing to document a physician's review of patient charts; and (5) telling a physician's assistant to use her own judgment in prescribing Tylenol with codeine. Dr. Koenig also testified that Michigan law specifically prohibits physician's assistants from prescribing controlled substances. Mich.Stat.Ann. § 14.15(17076)(3) [M.C.L.A. § 333.17076(3)]. Dr. Koenig did not specifically testify about Dudley or the operations at HMC.[13]

---

that a pharmacist knew that a purported prescription was not issued in the usual course of medical practice, a conviction will be sustained.

12. Dudley was acquitted of all mail fraud counts relating to fraudulent blood testing.

13. During the course of his testimony, Dr. Koenig stated "he doesn't have a license to conduct himself that way, and, therefore, it is illegal." Testimony of Dr. Koenig, Transcript vol. 13 at 70, *Hoskow et al.* (No. 85–80172). When read in its proper context, it is evident that Dr. Koenig

Dr. Koenig's expert testimony was offered to establish the standards of medical practice for issuing prescriptions. By responding to hypothetical questions, Dr. Koenig offered his expert opinion that certain practices, established by other evidence, were beyong the scope of legitimate medical practice.[14] The government's use of his expert testimony is consistent with other cases in which a physician is charged with distributing controlled substances by illegal prescriptions. *See United States v. Word,* 806 F.2d 658 (6th Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987); *accord United States v. Bartee,* 479 F.2d 484, 488 (10th Cir.1973). Thus, we find that permitting Dr. Koenig's testimony did not constitute plain error.

■■■ Kandah contends that his fifth amendment confrontation right and his sixth amendment right to compulsory process were violated because the district court quashed a subpoena *duces tecum.* Unpersuaded by Kandah's argument, we find that the district court did not abuse its discretion in quashing the subpoena.[15]

■■■ Decisions regarding the quashing of a subpoena *duces tecum,* submitted pursuant to Rule 17(c) [16] of the Federal Rules of Criminal Procedure, are committed to the trial judge's discretion. *See United States v. Nixon,* 418 U.S. 683, 702,

94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974) ("Enforcement of a pretrial subpoena *duces tecum* must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues."). On appeal, disturbing such a decision is unwarranted unless it is clearly arbitrary or without support in the record. *United States v. Reed,* 726 F.2d 570, 577 (9th Cir.1984), *cert. denied,* 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (citing *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)). After careful review of the record, we are convinced that the district court properly exercised its discretion.

Prior to trial, Kandah subpoenaed Gerald Bodendistal to produce all invoices from drug wholesale suppliers for any pharmacies in which he had a proprietary interest or was employed during the period of July 1986 through January 1987. The government moved to quash the subpoena on the grounds that the requested documents were not relevant or admissible at trial, that the defendant was engaging in a "fishing expedition" and that the subpoena was oppressive and unreasonable.[17]

The district court conducted a hearing on the subpoena *duces tecum* and found that Kandah had failed to meet Rule 17's requirements of relevance,[18]

was answering a hypothetical question about a physician's assistant who has not been licensed. Contrary to Dudley's assertion, Dr. Koenig was not expressing the opinion that Dudley's conduct was illegal.

**14.** Dr. Koenig was qualified as an expert pursuant to Fed.R.Evid. 702 and answered only hypothetical questions about medical practice.

**15.** As we are convinced that the requested material was of no relevance and Kandah had an opportunity to discredit the witness at trial, we find Kandah's constitutional claims are without merit. *See United States v. Valenzuela–Bernal,* 458 U.S. 858, 867–72, 102 S.Ct. 3440, 3446–49, 73 L.Ed.2d 1193 (1982) (to establish a violation of the sixth amendment's compulsory process guarantees, respondent must at least make a plausible showing that testimony sought was material and favorable to his defense). We will not address the constitutional claims further.

**16.** Rule 17(c) of the Federal Rules of Criminal Procedure provides:

A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

**17.** The subpoena called for thousands of invoices from fifty-three different pharmacy stores.

**18.** Kandah argues that the material is relevant because Bodendistal's pharmaceutical operations *may* parallel Kandah's operation. Kandah, however, failed to establish any basis for this comparison.

admissibility [19] and specificity. Additionally, the district court found that the subpoena was unreasonable and oppressive.

*United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), guides our analysis of this issue. In *Nixon,* the Supreme Court held that production pursuant to Rule 17(c) is appropriate where it is shown that: (1) the documents are evidentiary and relevant; (2) they are not otherwise procurable, with due diligence, in advance of trial; (3) the party cannot properly prepare for trial without such production and inspection in advance of trial; and (4) the application was made in good faith and is not a fishing expedition. *Id.* at 699, 94 S.Ct. at 3103. The record reveals that Kandah failed to meet any of the four requirements.

Kandah contends that the subpoena should not have been quashed because the documents would have been admissible for impeaching the credibility of the government's witness. However, the Supreme Court noted in *Nixon* that "the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." *Id.* at 701, 94 S.Ct. at 3104. The facts in the present case do not encompass the extraordinary circumstances that warranted the production of evidence in *Nixon.* In allowing the subpoena in *Nixon,* the Supreme Court noted the extraordinary circumstances of the tapes and their potential as direct evidence at trial, since they involved statements of alleged co-conspirators. Moreover, we have held that internal documents are not required to be produced when the witness' testimony at trial provides the information in the documents. *United States v. Schultz,* 855 F.2d 1217, 1223 (6th Cir.1988). Therefore, by analogy, Bodendistal's testimony regarding the pharmacy practice did not require the production of documents that substantiated such testimony. Accordingly, the district

court exercised sound discretion in quashing the subpoena.

Hoskow contends that the district court erred when it denied his motion for a mistrial after a witness, Robert Klick, testified that he first met Hoskow in the course of Hoskow's law practice. Hoskow maintains that the witness' testimony about his legal background violated the district court's order granting Hoskow's motion in limine. The order precluded the government from introducing evidence of Hoskow's prior bad acts. Hoskow argues that the references to his once being an attorney were highly prejudicial to his case.[20] After reviewing the record, we find Hoskow's contention unfounded. The district court properly denied Hoskow's motion for a mistrial.

Testimony concerning Hoskow's status as an attorney was presented on three occasions. In the first instance, Klick stated that he believed Hoskow was an attorney in his prior career. When Hoskow's attorney objected in an untimely manner and moved for a mistrial, the trial court refused to order a mistrial chiefly because Hoskow was not prejudiced by the testimony. Rule 403 of the Federal Rules of Evidence gives the district court the discretion to exclude relevant evidence on the grounds of unfair prejudice. Prior to Hoskow's testimony, the district court prohibited the government from introducing Hoskow's prior felony convictions, his disbarment, and facts concerning his law practice for impeachment pursuant to Rule 403 of the Federal Rules of Evidence. However, in the exercise of its discretion, the district court allowed the fact that Hoskow graduated from law school. Accordingly, Hoskow's law degree was brought out in cross-examination, without objection. This was the second instance when evidence concerning Hoskow's law degree was presented. On a third occasion, Dr. Leon Butler made a brief reference to Hoskow's former career.[21] The district court allowed the state-

---

19. The expert's own invoices could not be introduced into evidence as relevant to this case.

20. Hoskow contends that a juror volunteered to Hoskow's counsel, "Your client should have known better being an attorney." Based on this juror's alleged statement to his attorney, Hos-

kow argues that the jury convicted him based on the fact that he was once an attorney.

21. Explaining how he became associated with Hoskow, Dr. Leon Butler testified that "after dinner, [Mr. Passman] mentioned that *his ex-*

ment as it did not constitute grounds for a mistrial.

■ The district court, in ruling on Hoskow's objection and motion for a mistrial, referred to the motion in limine precluding prior bad acts. However, the district court held, and we agree, that reference to an attorney or former law partner does not fall within the precluded category of prior bad acts. We believe that this concept requires no elaboration. The district court exercised sound discretion in denying Hoskow's motion for a new trial.[22]

### III.

It is regrettable that greed has the power to inspire the callous exploitation of human suffering that this case exemplifies. We hold that there is substantial evidence to support defendants' respective convictions. The district court's exercise of sound discretion in this case involving complex issues and multiple parties merits our commendation. Accordingly, the judgment of the Honorable Julian Abele Cook, Jr. of the United States District Court for the Eastern District of Michigan is AFFIRMED.

*law partner,* Mr. Hoskow, was in the medical business, and perhaps he could help me with some of the problems I was having at that time." Transcript vol. 10 at 167–68, *Hoskow et al.* (No. 85–80172) (emphasis added).

**22.** The final issue that Hoskow raises on appeal pertains to the jury's use of transcripts, verified by the district court, while listening to tape recorded conversations. Hoskow argues that the district court erred in permitting this use of the transcripts. He contends that to avoid prejudice, transcripts should be permitted only where tape recordings are unintelligible or where all defendants stipulate to the use of transcripts. We reject Hoskow's argument and find it unworthy of extensive analysis.

The use of transcripts, like the admission of the underlying tapes, is a matter committed to the discretion of the trial court. *United States v. Robinson,* 707 F.2d 872, 878–79 (6th Cir.1983). In the absence of the parties' stipulation to a transcript's accuracy, the transcriber should attest to the accuracy of the transcript and the trial court should make an independent determination of its accuracy by listening to the tape while reading the transcripts. *Id.* at 878–79.

Hoskow's attorney objected to the accuracy of the transcripts. The government filed a motion for the court to review the transcripts. The court considered the testimony of the FBI agent who supervised the preparation of the transcripts and independently compared the transcripts to the tape. The court found only insignificant errors.

In its instruction to the jury, the district court properly cautioned that the transcripts were presented for the purposes of aiding their understanding of the tape, clarifying portions that were difficult to hear, and identifying speakers. The district court stated, "It would be a violation of your sworn duties as jurors to utilize the content of any of the transcripts in determining innocence or guilt.... *Only the tape is evidence. The transcript is not evidence.* Thus, you may utilize the tape for evaluating the merits of the case." Transcript vol. 15 at 106–08, *Hoskow et al.* (No. 85–80172 (emphasis added). Thus, the district court did not abuse its discretion.