932 F.2d 964
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James S. CHAPMAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald P. PERCIVAL, Defendant-Appellant.
 Nos. 90-5010, 90-5612.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 5, 1991.
Decided May 13, 1991.
As Amended June 5, 1991 and June 21, 1991.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, District Judge. (CR-89-306-A)
 Thomas Hylden, Richard J. Leon, Baker & Hostetler, Washington, D.C. (Argued), for appellants; Leonard C. Greenebaum, Gregory A. Paw, Baker & Hostetler, Washington, D.C., on brief.
 Paul G. Cassell, Assistant United States Attorney, Marcus J. Davis, Special Assistant United States Attorney, Alexandria, Va., (Argued), for appellee; Henry E. Hudson, United States Attorney, Alexandria, Va., on brief.
 E.D.Va., 727 F.Supp. 1015.
 AFFIRMED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and GRAHAM CALDER MULLEN, United States District Judge for the Western District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 The appellant Donald Percival (Percival) owned two pawn shops in Virginia, both of which were licensed to sell firearms. Appellant James Chapman (Chapman) worked for Percival on a parttime basis. Chapman and Percival sold more than sixty firearms to two co-conspirators, Dwayne Boger (Boger) and Anthony Pierce (Pierce), through a series of events, described as amounting to "straw transactions," in which Boger and Pierce brought persons eligible to purchase firearms in the Commonwealth into Percival's shops to purchase firearms for them. Put on trial, Percival and Chapman were convicted on one count of conspiracy to violate federal firearms laws in violation of 18 U.S.C. Sec. 371. Chapman was convicted on an additional count of an unlawful firearm sale in violation of 18 U.S.C. Sec. 922(b)(3). Percival was also convicted on two counts of unlawful firearms sales in violation of 18 U.S.C. Sec. 922(b)(3) and eight counts of failing to report firearms information in violation of 18 U.S.C. Sec. 922(b)(5).
 
 
 2
 The most compelling assertion of error concerns Percival's contention that the district court should have instructed the jury that a licensee cannot have violated 18 U.S.C. Sec. 922(b)(5) unless he knew that the actual purchaser was in fact ineligible to purchase the firearm. Yet on examination of that contention, such particularized knowledge does not constitute a part of the violation.
 
 
 3
 The evidence of the United States at trial was that Percival and Chapman, who had been extensively briefed by agents of the United States Bureau of Alcohol, Tobacco, and Firearms (ATF) on "straw purchases" and ATF Form 4473, had nevertheless completed dozens of such illegal straw purchases. The evidence primarily concerned straw purchases from Percival and Chapman made by Boger. The United States presented testimony from Boger and five different women (Melissa Lewis, Gwendolyn Walden, Candrice Lewis, Andrea Moore, and Bernadette Richey) who played the role of straw purchasers. All six witnesses gave indistinguishable testimony about dozens of firearms transactions at Ted's Coins.
 
 
 4
 The women were not involved in the selection of the firearms. Rather, after Boger selected which weapons he wanted to purchase, his female friend would be summoned over to help with the "paperwork." Percival and Chapman gave the Form 4473 to the women, never once handing the form to Boger. The only involvement of the women in any of the transactions was to sign the Forms 4473.
 
 
 5
 After the "paperwork" was completed, Boger and the appellants would close the deal. Boger paid for the firearms in cash, pulling out wads of small bills described by one of the women as "dirty money." Boger got any change involved and received the receipts. Occasionally, Boger would be a little "short," in which case Percival or Chapman would simply extend him credit for his next visit to the store. Boger received discounts from Percival for quantity purchases. Boger then left the store carrying the guns purchased.
 
 
 6
 Boger identified Percival and Chapman as the only persons he dealt with at Ted's Coins. Boger's female accomplices testified that all they did in the transactions was sign the Forms 4473 and that they were never asked whether the firearms they signed for were for them.[1]
 
 
 7
 All told, Boger purchased sixty-one firearms from Percival and Chapman from October 12, 1988 to March 18, 1989, in twenty-four different trips (including two trips made on the same day) to Ted's Coins. Boger testified that he resold the weapons in the District of Columbia. Indeed, in one instance he told Percival that he would be back as soon as he could "get rid" of the weapons. Appellants stipulated that twenty-one of Boger's sixty-one purchases were recovered by law enforcement authorities in the District of Columbia metropolitan area close to the places where Boger testified that he had resold the weapons.
 
 
 8
 Corroborating the testimony of Boger and his female friends were five straw purchases made at Ted's Coins by ATF undercover agents. On March 30, 1989, Chapman was alone at Ted's Coins running the store. ATF Agent McCall, who truthfully identified himself as a Texas resident, and Agent Chambers negotiated the purchase of two pistols from Chapman. As to McCall's Texas residency, Chapman told McCall:
 
 
 9
 You have to have a Virginia address and a Virginia ID. Then, you can buy any one you want. (Unintelligible), DMV, and they will give you one in 20 minutes.
 
 
 10
 When McCall asked whether somebody else with a Virginia driver's license could purchase the firearms for McCall, Chapman replied "Uh, I don't know what you're talking about," but at the same time winked and gave a facial expression suggesting just the opposite. McCall then asked Chapman to hold the firearms for him and left the store.
 
 
 11
 McCall and Chambers returned approximately one half hour later with Agent Graham who was in an undercover capacity and was carrying a Virginia driver's license as identification. Chapman greeted the undercover agents by asking McCall whether he had brought someone to do the paperwork. McCall then proceeded to pay for the firearms, receiving the change and receipt, while Agent Chambers received the firearms. Only upon Graham's completing the form did Chapman ask Graham whether the firearms were for him. Graham answered "Yes." Four more successful straw purchases were conducted by undercover ATF agents on April 11 (two purchases), April 20, and May 31, 1989.
 
 
 12
 Throughout the trial, Percival and Chapman sought to prove that they conducted the "straw purchases" with the belief that they were acting in cooperation with the ATF as part of a large undercover operation. Yet several ATF agents testified to their discussions with Percival concerning firearms sales and their testimony revealed that Percival and Chapman gave incomplete, misleading, and false accounts of the straw purchases that Boger and others were making repeatedly at Ted's Coins.[2]
 
 
 13
 Percival and Chapman both took the stand in their defense. Percival testified that when he first met Boger, the women picked out the guns. But later on, "[i]t was more relaxed" and Boger "would actually look at the guns, pick at them ... and the transaction would be made, and she would fill out the 4473." On cross-examination, Percival also slipped from his story and testified:
 
 
 14
 [Boger] bought an array of guns, .22s, .25s, .32s, .45s, 9 millimeters. You know, he didn't buy just one specific gun; they were all different styles and sizes, sir. But he did--he didn't buy, but the people who were with him purchase those types guns and mostly ... the M-11's.
 
 
 15
 Percival admitted that he told Boger that acid would not remove the serial number from firearms. Percival also conceded that he might have told Boger how to break down a Glock handgun into metal and plastic parts and how to repair a Cobray M-11 that had malfunctioned. Percival claimed he did not want to be "rude" or "mean" to Boger, because ATF "wanted him to come back" as part of some on-going investigation. He admitted that Boger carried the firearms from the store. As to his knowledge that a straw sale was prohibited, Percival testified:
 
 
 16
 Q. At the time, you knew it was illegal for one person to buy a gun, [and] have another just sign the forms?
 
 
 17
 A. [Percival:] Yes, sir, as long as I knew that was happening, yes, sir.
 
 
 18
 Percival also admitted that he knew that Boger's guns were "going into D.C." As to his relationship with Chapman, Percival testified that Chapman helped out around the store, sometimes assisting Percival in completing a Form 4473 during sales to Boger.
 
 
 19
 Chapman also testified on his own behalf. He said that he had been "helping out" at Percival's store since around 1984. Chapman persistently claimed he did not work for Percival, explaining that he "didn't want it to be misconstrued by my previous employer [the U.S. Secret Service] that I was working there" because such employment required prior approval. Yet Chapman admitted that he kept an hour-by-hour record of the days he worked at Percival's store, and calculated a conversion to wages owed by valuing his time at $10.00 an hour. Chapman maintained that he was performing a merely idle exercise to show Percival how valuable his work was.
 
 
 20
 Regarding straw sales, Chapman acknowledged "one person couldn't buy a weapon for someone else; that's basically it." Yet contrary to the testimony of six government witnesses--Boger, the Lewis sisters, Moore, Walden, and Richey--Chapman testified that Boger's female friends always paid for the guns, that Boger never picked out a weapon, and that Boger never discussed the weapons.
 
 
 21
 Of twenty-four firearms transactions in which Boger purchased firearms from Ted's Coins using women as straw purchasers, Chapman acknowledged concluding seven of them. He further admitted handling the transaction with Agent McCall on March 30, 1989.[3]
 
 
 22
 On September 9, 1989, a grand jury in the United States District Court for the Eastern District of Virginia returned an eighteen-count indictment against Percival, Chapman, and Boger. The indictment charged the three defendants with conspiracy in violation of 18 U.S.C. Sec. 371 (Count I); Percival with failing accurately to report information about firearms purchasers in violation of 18 U.S.C. Sec. 922(b)(5) (Counts II through X); Boger with five counts of providing false firearms information in violation of 18 U.S.C. Sec. 924(a)(1)(A) (Counts XI through XV); Chapman with one count of unlawful firearms sales and Percival with two counts of unlawful firearms sales in violation of 18 U.S.C. Sec. 922(b)(3) (Counts XVI through XVIII).
 
 
 23
 On September 28, 1989, Boger pled guilty to the conspiracy count and one false firearms information count and agreed to testify against his co-conspirators Percival and Chapman.
 
 
 24
 On November 6, 1989, a trial by jury commenced which lasted five days. On November 10, 1989, the jury returned a verdict of guilty on all counts with the sole exception of finding Percival not guilty on count eight.[4]
 
 A plethora of issues emerged on appeal:
 
 25
 1. Whether the conspiracy count should be reversed because the government, in proving the existence of multiple conspiracies, failed to prove a single conspiracy?
 
 
 26
 2. Whether the district court abused its discretion in declining to submit to the jury one of Percival's and Chapman's theories of the case?
 
 
 27
 3. Whether the district court abused its discretion in declining to instruct the jury that a) violation of 18 U.S.C. Sec. 922(b)(5) required that Percival knew that the "true purchasers" of the firearms were in fact ineligible to purchase firearms and that b) section 922(b)(5) must be "knowingly" violated?
 
 
 28
 4. Whether the evidence was sufficient to support the jury's verdicts against Percival and further support the district court's denial of Percival's motion for a new trial?
 
 
 29
 5. Whether the district court erred in holding that secret grand jury testimony regarding the government's position on the statutory definition of "purchaser" did not work an estoppel against the government?
 
 
 30
 6. Whether the evidence was sufficient to support the jury verdicts against Chapman?
 
 
 31
 7. Whether the district court erred in ruling that a wink by Chapman to government agents was not a "written or recorded statement" covered by Federal Rule of Criminal Procedure 16?
 
 
 32
 8. Whether the district court abused its discretion in declining to hold an evidentiary hearing on Chapman's allegations of perjury against two government agents?
 
 
 33
 Realizing that under Glasser v. United States, 315 U.S. 60, 80 (1942), sufficiency of the evidence is construed in the light most favorable to the government, a single conspiracy was shown though several spokes existed, joined by a single hub.[5] It was not error to refuse to instruct what was better suited to closing argument,[6] and it was inappropriate to charge that proof was required of knowledge that the true purchaser was ineligible to purchase firearms.[7] An estoppel of the government was not made out,[8] evidence was sufficient in Chapman's case,[9] and overwhelming in Percival's case,[10] validating the denial of a new trial. The contention that a wink, as a recollection of witnesses, is a "written or recorded statement" violates the meaning of the Federal Rules of Criminal Procedure,[11] and it was no abuse of discretion to decline to hold an evidentiary hearing on farfetched allegations of perjury by government agents.[12]
 
 Accordingly, the judgment is
 
 34
 AFFIRMED.
 
 
 
 [1]
 Tona Scales testified briefly to essentially the same sort of straw purchases from Percival and Chapman on behalf of Pierce. The purchases in which she was involved occurred at Percival's two stores, one in Woodbridge and one in Stafford. Pierce, known to her as "Anthony" or "Tony," selected the firearms. On the first transaction (December 17, 1988), both Pierce and Percival took the firearms and ammunition from from the store to Pierce's automobile because of the number of firearms involved. On the next transaction (December 18, 1988), Pierce called the Stafford store to make sure it would be open and that it had the firearms he wanted. Percival confirmed the call in cross-examination. Chapman also participated in the sale. Pierce carried the firearms from the store. Scales' role was merely to sign the Forms 4473. Scales was never asked whether the firearms for which she signed were for her
 
 
 [2]
 Percival claims that he "cooperated" with ATF by submitting a multiple sales report to ATF whenever he sold more than one handgun. Percival was, however, required by law to submit that report. See 18 U.S.C. Sec. 923(g)(3)
 
 
 [3]
 A handwriting expert also established which transactions Percival and Chapman had handled by analyzing the handwriting on the Forms 4473
 
 
 [4]
 Count VIII charged that Percival had failed to keep proper records in connection with a firearms sale to an undercover agent on March 30, 1989. The government's handwriting expert analysis revealed that, in fact, Chapman had made the false records for that sale, a fact which Chapman acknowledged
 
 
 [5]
 United States v. Leavis, 853 F.2d 215, 218 (4th Cir.1988); United States v. Urbanik, 801 F.2d 692, 695-96 (4th Cir.1986); United States v. Dorta, 783 F.2d 1179, 1183 (4th Cir.), cert. denied, 477 U.S. 905 (1986). Even if inconsistency of verdicts took place, consistency of verdicts is not required for a finding of conspiracy. United States v. Lawson, 682 F.2d 480, 484 (4th Cir.), cert. denied, 459 U.S. 991 (1982)
 
 
 [6]
 The instructions numbered 1 and 2 were adequate to convey Percival's and Chapman's theory of the case. United States v. Dornhoffer, 859 F.2d 1195, 1199 (4th Cir.1988), cert. denied, 490 U.S. 1005 (1989)
 
 
 [7]
 Percival and Chapman have sought without success to increase the legal stature of a manifestly non-genuine purchaser or strawman into the genuine purchaser for purposes of 18 U.S.C. Sec. 922(b)(5). Boger, exercising an obvious scheme, was the buyer of sixty-one firearms. Cf. United States v. Faurote, 749 F.2d 40 (7th Cir.1984). The complaint that there was failure to charge that Sec. 922(b)(5) violations must be made knowingly need not detain us in light of the fact that the point was not preserved for appeal. United States v. Cornett, 484 F.2d 1365, 1368 (6th Cir.1973); Fed.R.Crim.P. 30; Fed.R.Crim.P. 52(b). That the omission was inadvertent is irrelevant, the purpose behind the rule not thereby being altered. Duty v. East Coast Tender Service, Inc., 660 F.2d 933, 941 n. 18 (4th Cir.1981)
 
 
 [8]
 Whether an estoppel or reliance theory could be made out by Percival's and Chapman's following of suggestions from the government we need not inquire into because those theories rested in the main on self-serving testimony which the jury simply chose not to believe. See United States v. Shipp, 409 F.2d 33, 36 (4th Cir.), cert. denied, 396 U.S. 864 (1969). Evidence refuting Percival's and Chapman's theory of defense was overwhelming; "reversal of conviction on grounds of insufficient evidence should be 'confined to cases where the prosecution's failure is clear.' " United States v. Jones, 735 F.2d 785, 791 (4th Cir.), cert. denied, 469 U.S. 918 (1984) (quoting Burks v. United States, 437 U.S. 1 (1978))
 
 
 [9]
 The assertion of insufficiency of evidence to sustain a conviction against Chapman seeks in another context to equate a purported but non-genuine purchaser with a real or actual purchaser. The evidence sought to be relied on was countered by the witness' other testimony that her acts were in the context that "he was actually making the purchases ... [and] ... she never actually possessed the firearms." The jury as the fact-finder was the maker of credibility findings
 
 
 [10]
 The assertion of insufficiency in the face of the strength of the evidence and the holding of Glasser v. United States, 315 U.S. 60, 80 (1942), borders on the frivolous
 
 
 [11]
 A report of a wink negating a contemporary statement by Chapman is asserted to have been error under Federal Rule of Criminal Procedure 16(a)(1)(A), requiring the making available of "written or recorded statements made by the defendant[s] ... within the possession, custody or control of the government." The failure of Chapman to object, United States v. Breit, 712 F.2d 81, 82-83 (4th Cir.1983), and the strength of the government's case without the wink serve to render it hardly necessary to investigate whether a wink has been written or recorded. In any event, in a situation such as here presented, it is sufficient to observe that a statement memorialized only in the recollection of the witness is not discoverable under Rule 16. United States v. McClure, 734 F.2d 484, 493 (10th Cir.1984); United States v. Viserto, 596 F.2d 531, 538 (2d Cir.), cert. denied, 444 U.S. 841 (1979)
 
 
 [12]
 An assertion has been made that ATF agents perjured themselves regarding the wink. Testimony is characterized by Chapman as "inherently incredible." However, review of the criticized evidence reveals that eliminating Chapman's somewhat attenuated hypotheses establishes that agents were consistently logical, leaving plenty of opportunity--substantial evidence--for the jury, as the arbiter of credibility, to find as they did