16 F.3d 1223
 Medicare&Medicaid Guide P 42,064
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carol SIMS-ROBERTSON, M.D.; Roger M. Morrell, M.D.;
Reginald Roquemore; Gerald Najor, R.Ph.; Greg
Baise, R.Ph.; Dennis McAlpin, R.Ph.;
Richard Maurer, R.Ph.;
Defendants-Appellants.
 Nos. 92-1076, 92-1080, 92-1082, 92-1090, 92-1094, 92-1096, 92-1115.
 United States Court of Appeals, Sixth Circuit.
 Jan. 18, 1994.
 
 Before: NORRIS and SILER Circuit Judges; and OAKES,* Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants appeal their convictions and sentences for RICO, drug conspiracy, mail fraud conspiracy, and numerous drug distribution, mail fraud and Medicaid fraud offenses. For reasons stated hereafter, we affirm the convictions and sentences for all defendants except Reginald Roquemore, whose sentence we vacate and remand to the district court for reconsideration in light of United States v. Romano, 970 F.2d 164, 167 (6th Cir.1992).
 
 I. Facts
 
 2
 This appeal arises from a jury trial which lasted over three months resulting in the convictions of two physicians (Sims-Robertson and Morrell), four pharmacists (McAlpin, Najor, Maurer and Baise) and the owner and operator (Roquemore) of a medical clinic on charges of RICO, drug conspiracy, mail fraud conspiracy, and numerous drug distribution, mail fraud and Medicaid fraud offenses. All of the defendants, except Dr. Morrell, were also convicted of RICO conspiracy. Further, Roquemore, Baise and Maurer were convicted of Medicaid kickback conspiracy and a Medicaid kickback offense. The defendants were sentenced to terms of imprisonment ranging from six and one-half to twelve years. Some sentences were subject to the guidelines and some were not.
 
 
 3
 The setting for the underlying offenses concerns the operation of the Second Selden Medical Clinic (SSMC), which engaged in fraudulent blood testing and illegal distribution of controlled substances. Two cooperating pharmacies, Selden Drugs and University Village Pharmacy (UVP), filled the illegal prescriptions and billed Medicaid for both the cost of the drugs and a dispensing fee, and then paid SSMC a kickback for each prescription filled.
 
 
 4
 Defendants' involvement in the operation of SSMC was manifested in several ways. Roquemore, owner and operator of SSMC, hired unlicensed physician's assistants to "treat" the patients, established a policy where all patients were given a blood test on their first visit and every six months thereafter, and arranged for Selden Drugs and UVP to fill the controlled and non-controlled prescriptions for SSMC.
 
 
 5
 Sims-Robertson and Morrell were the doctors of record at various times for SSMC. They were hired to supervise the "practice of medicine," but their duties actually consisted of signing charts for fifteen minutes to a few hours a week, allowing their DEA and Medicaid numbers to be used by SSMC, and picking up their paycheck. Dr. Morrell never examined a single patient, and Dr. Sims-Robertson only treated one or two patients in two years at SSMC.
 
 
 6
 McAlpin and Najor, pharmacists and part owners of Selden Drugs, filled SSMC prescriptions. Maurer, pharmacist and sole owner of UVP, and Baise, pharmacist and officer of UVP, filled SSMC prescriptions and set up and participated in a Medicaid kickback scheme with Roquemore at SSMC.
 
 
 7
 Pacifico Medado, an unlicensed physician's assistant at SSMC from 1984 to January 1988, received little, if any, supervision from the doctors at SSMC. He implemented the "blood for pills" plan set up by Roquemore where patients received controlled substances in exchange for giving blood for which Medicaid would pay. If patients refused to give blood, Medado would refuse to give them pills. His "supervising" doctors did not review the patients' charts until long after the patients were examined, controlled drugs were prescribed, and the blood tests were ordered.
 
 
 8
 The SSMC patients were primarily drug abusers or sellers who would come to the clinic, usually complaining of back pain. The patients would then give four tubes of blood in order to get prescriptions for, or actually receive, controlled substances. Then, the patients would sell the controlled drugs, sometimes on the premises of SSMC, to support their drug habits. SSMC billed Medicaid directly for the blood testing and received a kickback from UVP for SSMC prescriptions.
 
 II. Analysis
 
 9
 On appeal, defendants raise a variety of issues. We will address each issue individually on the grounds raised by each defendant.
 
 A. Sufficiency of the evidence
 
 10
 The standard of review in a criminal case for claims of insufficient evidence is " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). This standard gives "full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts." Jackson, 443 U.S. at 319.
 
 
 11
 "A defendant claiming 'insufficiency of the evidence bears a very heavy burden.' " United States v. Vannerson, 786 F.2d 221, 225 (6th Cir.) (quoting United States v. Soto, 716 F.2d 989, 991 (2d Cir.1983)), cert. denied, 476 U.S. 1123 (1986). This court "will reverse a judgment for insufficiency of evidence only if th[e] judgment is not supported by substantial and competent evidence upon the record as a whole, and ... this rule applies whether the evidence is direct or wholly circumstantial." United States v. Stone, 748 F.2d 361, 362 (6th Cir.1984).
 
 1. Dr. Morrell
 
 12
 Dr. Morrell contends the government failed to prove his activities fell outside the usual course of medical practice as required in order to convict him for the charged drug distribution and conspiracy offenses. See 31 C.F.R. Sec. 1306.04;[1] United States v. Kirk, 584 F.2d 773, 784 (6th Cir.), cert. denied, 439 U.S. 1048 (1978). His primary complaint is that the prosecution focused on conduct occurring prior to his employment with SSMC.
 
 
 13
 In determining the standard of practice of Dr. Morrell, the "jury had a right to consider all of the evidence before the court bearing on the subject." Kirk, 584 F.2d at 785. There was more than sufficient evidence from which the jury could have drawn inferences that Dr. Morrell's conduct was outside of the usual course of professional practice. See id. at 785-86. For example: (1) Dr. Morrell never examined a patient at SSMC, as he used an unlicensed physician's assistant to do his work; (2) expert witnesses testified that after-the-fact supervision was not legitimate professional practice; (3) medical experts testified that Dr. Morrell's practice of prescribing Tylenol with codeine to drug addicts was a very rare practice in the medical profession and should have only been done in a supervised (in-patient) setting for a few days; and (4) Dr. Morrell prescribed drugs at SSMC while it had a policy of "no blood, no pills." Any of those examples standing alone might be sufficient to uphold the jury's verdict. When the examples are viewed together in a light most favorable to the prosecution, it is abundantly clear that a rational trier of fact could have found beyond a reasonable doubt that Dr. Morrell acted outside the scope of the usual course of medical practice.
 
 
 14
 Dr. Morrell also contends the government failed to prove that he was part of the ongoing "enterprise" made up of SSMC, UVP and Selden Drugs. Proof of an ongoing enterprise is necessary to establish a violation of RICO, 18 U.S.C. Sec. 1962(c). However, it is not essential that the government prove continuing participation of all members in the enterprise throughout its entire life. United States v. Hewes, 729 F.2d 1302, 1310-12 (11th Cir.1984), cert. denied, 469 U.S. 1110 (1985). As the Third Circuit has aptly stated:
 
 
 15
 [The continuing enterprise requirement] does not mean that individuals cannot leave the group or that new members cannot join at a later time. It does require, however, that each person perform a role in the group consistent with the organizational structure ... and which furthers the activities of the organization.
 
 
 16
 United States v. Riccobene, 709 F.2d 214, 223 (3d Cir.), cert. denied, 464 U.S. 849 (1983).[2] When the evidence is viewed in the light most favorable to the government, it is evident that there was sufficient evidence for the jury to rationally conclude that an enterprise was operating and that Dr. Morrell acted in furtherance of it.
 
 2. Dr. Sims-Robertson
 
 17
 Dr. Sims-Robertson contends the government failed to prove that she agreed to enter into an illegal scheme, or that her conduct was outside the course of usual medical practice. She states that this appears to be a case of guilt by association.
 
 
 18
 Dr. Sims-Robertson claims that the issue of sufficiency of evidence to uphold her conviction turns on the application of United States v. Hughes, 895 F.2d 1135 (6th Cir.1990).[3] Interestingly, the Hughes court affirmed the convictions of two pharmacists, the owner of a blood testing lab, and the "doctor of record" at a medical clinic on various counts of RICO conspiracy, unlawful distribution of controlled substances, and mail fraud. Id. at 1139, 1147. The logical inference arising from Dr. Sims-Robertson's brief is that as her bad conduct, if any, did not reach the level of her counterpart in Hughes, Dr. Dudley, this court should reverse her conviction because the evidence was insufficient. Unfortunately for Dr. Sims-Robertson, Hughes does not establish the minimum evidentiary proof requirements necessary to convict a physician for RICO conspiracy or unlawful distribution of controlled substances.
 
 
 19
 A defendant's agreement to participate in a RICO conspiracy may be inferred from her acts. United States v. Joseph, 835 F.2d 1149, 1152 (6th Cir.1987). Even if the evidence presented is wholly circumstantial, it is sufficient to sustain a conviction. Ellzey, 874 F.2d at 328; Stone, 748 F.2d at 363.
 
 
 20
 The following facts stand unrefuted. Over a two-year career at SSMC, Dr. Sims-Robertson only saw one or two patients. Although she may have been present at SSMC one to three hours a week, her work consisted of signing and revising patient charts. She allowed the clinic to use her provider number to bill Medicaid two months before she began work at SSMC. Further, she signed patient charts for patients "treated" at SSMC before she began her employment, thus legitimating the practices of SSMC. Moreover, she told a physician's assistant to add information to patient charts so the charts would look better in case of investigation. Finally, she also continued working, for one week, at SSMC after she was informed that her physician's assistant, Medado, was unlicensed.
 
 
 21
 The foregoing facts alone are sufficient to support Dr. Sims-Robertson's conviction. Her acts clearly support an inference that she was involved in a RICO conspiracy and that she was acting outside the course of usual professional practice. Moreover, expert witnesses testified that the prescribing and blood testing patterns under Dr. Sims-Robertson at SSMC were outside the course of legitimate medical practice.
 
 3. Maurer and Baise
 
 22
 Maurer and Baise contend there was insufficient evidence to convict them of mail and Medicaid fraud, conspiracy to commit Medicaid fraud, RICO, conspiracy to commit RICO, or unlawful distribution of controlled substances. They argue that there was no evidence that they knowingly and intentionally distributed controlled substances or that they acted outside of the usual course of professional practice.
 
 
 23
 Maurer and Baise had knowledge of the kickback scheme since Maurer programmed the computer to enter "0" for co-pays from SSMC prescriptions even though UVP actually collected 50 cent co-pays, and Baise directed a pharmacy employee to set aside the SSMC co-pays for Roquemore to pick up. Maurer and Baise had actual knowledge that the patients from SSMC were drug addicts, that there was a high volume of controlled substances prescribed to the SSMC patients, and that the SSMC patients tried to refuse the non-controlled drugs prescribed for them. A pharmacy expert also testified that under the facts of this case, the usual course of professional conduct would have been to not fill the controlled substance prescriptions from SSMC. Finally, it is undisputed that both Maurer and Baise filled SSMC prescriptions at UVP.
 
 
 24
 When viewed in a light most favorable to the government, the proof clearly supports the conviction of Baise and Maurer for those charges. While the government did not prove actual knowledge of a conspiracy or an agreement to conspire, it did show acts of Maurer and Baise which were sufficient for the jury to infer their knowledge of conspiracy and agreement to conspire. See Joseph, 835 F.2d at 1152.
 
 
 25
 Maurer and Baise also argue there was insufficient evidence to support the convictions for illegal kickbacks or kickback conspiracy. Their basis for this argument is that the government failed to show actual knowledge of a kickback scheme, or, alternatively, that the kickback was not an inducement to SSMC. This argument is without merit. As noted above, the government proved the defendants had knowledge of the kickback. Furthermore, the fact that a pharmacy receiving 100 percent of SSMC's prescription business would have a net increase in profits of $270.00 per day is sufficient evidence for a jury to infer that the co-pay money was an inducement for SSMC's business.
 
 
 26
 Maurer and Baise make a final joint contention that the evidence was insufficient to prove they were knowing members of the RICO conspiracy or that they were part of an "enterprise." The analysis above indicates that sufficient proof was present for the jury to find the defendants had knowledge of the conspiracy. Regarding the "enterprise" argument, this court has specifically rejected the position, proffered by defendants, that "there must be proof of an enterprise distinct from proof of a pattern of racketeering." Qaoud, 777 F.2d at 1115.
 
 
 27
 The government provided sufficient proof of a "pattern of racketeering" by showing, inter alia, unlawful distribution of controlled substances and mail fraud.[4] The government was not required to provide separate proof of the existence of an enterprise.
 
 
 28
 Baise makes one additional contention concerning insufficiency of evidence. He claims there was "little evidence from which this jury could conclude that he was aware of the totality of the situation at Second-Selden Clinic." This argument is frivolous in light of the foregoing examples of the government's proof. A rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt. Ellzey, 874 F.2d at 328.
 
 
 29
 B. Constitutionality of 21 U.S.C. Secs. 841 and 846
 
 
 30
 Dr. Morrell argues that his conviction for unlawful distribution of controlled substances and conspiracy under 21 U.S.C. Secs. 841, 846 should be reversed because the statutes are void for vagueness and they violate the Due Process Clause of the Fifth Amendment. Dr. Morrell's due process argument alleges that it is violative of due process for the jury to judge his conduct based on professional standards arising from ambiguous state laws.
 
 
 31
 In light of United States v. DeBoer, 966 F.2d 1066, 1068-69 (6th Cir.1992), Dr. Morrell's constitutional claim is without merit. In Deboer, the defendant urged that he was denied his constitutional right to due process because the government failed to prove he acted outside the scope of his profession. Crucial to the defendant's reasoning was proof that the conduct proscribed in 21 U.S.C. Sec. 841(a)(1) was void for vagueness. The court stated that "the language in Sec. 841(a)(1) clearly defines the pharmacist's responsibilities that give rise to conduct that constitutes an unlawful distribution of a prescription drug." Id. at 1068-69. Moreover, this circuit has consistently upheld convictions under the challenged statutes in cases where the standard of conduct of the professional was derived from testimony concerning general standards of acceptable conduct. See id.; United States v. Hughes, 895 F.2d 1135, 1142 (6th Cir.1990); United States v. Kirk, 584 F.2d 773, 784-85 (6th Cir.), cert. denied, 439 U.S. 1048 (1978).
 
 
 32
 A jury should be able to consider all of the evidence before it when deciding whether a professional acted outside the appropriate standard of conduct. Kirk, 584 F.2d at 785. The jury had sufficient evidence to conclude that Dr. Morrell's conduct was unacceptable.
 
 C. The charge by the grand jury
 
 33
 Roquemore, Maurer, Baise and Najor contend they were improperly indicted concerning the charge of unlawful distribution of schedule II narcotics.
 
 
 34
 "[A]n indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence...." United States v. Calandra, 414 U.S. 338, 345 (1974) (citing Costello v. United States, 350 U.S. 359, 363 (1956)). However, if a defendant can show that he was actually prejudiced by the grand jury's consideration of perjured testimony, then dismissal of the indictment may be warranted. United States v. Adamo, 742 F.2d 927, 939-41 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985); but cf. United States v. Short, 671 F.2d 178, 182 (6th Cir.) (stating that "[t]his court has consistently given the Costello language a literal reading: 'An indictment returned by a legally constituted and unbiased grand jury ... if valid on its face, is enough to call for trial of the charge on the merits.' 350 U.S. at 363."), cert. denied, 457 U.S. 1119 (1982).
 
 
 35
 Roquemore, Maurer and Baise argue they were denied the right to a fair trial because of prosecutorial misconduct at the grand jury level. Defendants claim the government knowingly presented false testimony to the grand jury concerning the distribution of schedule II drugs. Their contention is grounded on the false testimony of government witnesses James Stewart and Willie Brantley concerning their receipt of schedule II narcotic prescriptions from SSMC. Defendants claim that after receiving knowledge of the false testimony, the government wrongfully failed to correct the testimony or change the charges concerning the distribution of schedule II narcotics.[5]
 
 
 36
 The government claims that even without the testimony of Brantley and Stewart the grand jury had sufficient evidence to support the indictment for unlawful distribution of schedule II narcotics. To wit, the testimony of David Sandfoss and Dauphne Jones directly, or by inference, provided support for the conclusion that schedule II narcotics were prescribed by SSMC. Further, the jury had before it the subpoenaed medical records of SSMC which clearly reflected the distribution of schedule II narcotic prescriptions. Therefore, the government posits that the defendants suffered no prejudice by the jury's consideration of Stewart's and Brantley's testimony.
 
 
 37
 However, the prosecution may determine whether to allow an indictment to stand when perjured testimony is presented to the grand jury. See Adamo, 742 F.2d at 941 (rejecting the Ninth Circuit rule requiring the prosecution to correct erroneous testimony before the grand jury). Further, an indictment returned by a legally constituted and unbiased jury cannot be challenged. Calandra, 414 U.S. at 345. Therefore, the defendants were properly charged by the grand jury. Moreover, defendants have failed to show actual prejudice by the grand jury's consideration of the perjured testimony. See Adamo, 742 F.2d at 941.
 
 
 38
 Najor alleges that he was convicted on Count III[6] as the result of an impermissible constructive amendment to the indictment.[7] His allegation is based on the fact that the court submitted a special interrogatory to the jury asking whether he was involved in the unlawful distribution of schedule II desoxyn.
 
 
 39
 The district court's interrogatory to the jury did not create a substantial likelihood that Najor may have been convicted of an uncharged offense. See Hathaway, 798 F.2d at 910. As Najor was convicted of exactly what he was charged with, there was no constructive amendment of the indictment.
 
 
 40
 In his reply brief, Najor raises a new argument concerning his conviction under count three of the indictment. His new argument is that there was insufficient evidence to convict him for RICO conspiracy involving the schedule II drug desoxyn. As this argument was raised for the first time in his reply brief, it will not be considered by this court. Wright v. Holbrook, 794 F.2d 1152, 1156 (6th Cir.1986).[8]
 
 D. Severance
 
 41
 Baise, Maurer and Dr. Sims-Robertson argue the trial court erred in denying their motion to sever counts 149 and 150 regarding the charge that McAlpin unlawfully distributed a schedule II controlled substance, Dilaudid.[9] Their motion to sever was based on Fed.R.Crim.P. 8(b) and 14.[10]
 
 
 42
 The Supreme Court has stated the following regarding review of claims based on Rule 8(b) and 14:
 
 
 43
 Rule 14's concern is to provide the trial court with some flexibility when a joint trial may appear to risk prejudice to a party; review of that decision is for an abuse of discretion. Rule 8(b), however, requires the granting of a motion for severance unless its standards are met, even in the absence of prejudice; review on appeal is for an error of law. Applying the harmless-error rule to Rule 8(b) misjoinder simply goes to the additional question whether the error requires setting aside the convictions.
 
 
 44
 United States v. Lane, 474 U.S. 438, 449 n. 12 (1986).
 
 
 45
 The harmless-error rule focuses on the error's effect on the substantial rights of the defendant. "[A]n error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.' " Id. at 449 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). To show abuse of discretion, a defendant "must show an inability by the jury to separate and treat distinctively evidence that is relevant to each particular defendant on trial. Even if defendant may establish some potential jury confusion, this must be balanced against society's need for speedy and efficient trials." United States v. Gallo, 763 F.2d 1504, 1525 (6th Cir.1985) (citations omitted), cert. denied, 474 U.S. 1068, and cert. denied, 474 U.S. 1069, and cert. denied, 475 U.S. 1017 (1986). Stated otherwise, a "defendant has the burden of proving that substantial prejudice resulted from the court's failure to grant a separate trial." United States v. Zalman, 870 F.2d 1047, 1053 (6th Cir.), cert. denied, 492 U.S. 921 (1989).
 
 
 46
 Baise and Maurer joined a pretrial motion on behalf of Dr. Morrell to dismiss the indictment or for severance pursuant to Fed.R.Crim.P. 8(b) and 14. However, Dr. Sims-Robertson did not make any pretrial motions regarding severance. Failure to raise an issue involving a misjoinder or a defect in an indictment prior to trial results in a waiver of a defendant's rights concerning the issue. Fed.R.Crim.P. 12(b)(2), (5); United States v. Williams, 711 F.2d 748, 750-51 (6th Cir.), cert. denied, 464 U.S. 986 (1983); United States v. Rox, 692 F.2d 453, 454 (6th Cir.1982). Consequently, this court will not consider the claims of Dr. Sims-Robertson concerning the trial court's failure to deny severance.
 
 
 47
 Baise and Maurer first argue that the joinder of counts 149 and 150 was improper as a matter of law under Rule 8(b) as the charges in those counts in no way involved the SSMC. They then argue that the misjoinder caused actual prejudice and was not harmless error. Their basis for prejudice is grounded on the admission of bad character and "other crimes" testimony under Federal Rule of Evidence 404(b) concerning McAlpin.[11]
 
 
 48
 The government argument is threefold: (1) the district court did not abuse its discretion in denying the motion for severance; (2) the defendants have failed to show substantial prejudice by the admission of the other acts evidence pertaining to McAlpin; and (3) even if there was error in the lower court, it was harmless error in light of the overwhelming evidence of guilt. According to the government, the "offenses charged in counts 149 and 150 against defendant McAlpin were 'interrelated and pertained to similar types of offenses' as those charged in the other counts of the indictment." See United States v. Lawson, 780 F.2d 535, 544 (6th Cir.1985)). Specifically, counts 149 and 150, like the counts against the other defendants, charged McAlpin with unlawfully distributing controlled substances outside the course of usual professional practice.
 
 
 49
 The government's broad view of offenses that can be joined under an indictment is unwarranted. In United States v. Hatcher, 680 F.2d 438, 440 (6th Cir.1982), the court found impermissible joinder as a matter of law where counts of cocaine distribution and possession against defendant Hatcher alone were joined in an indictment with counts of heroin distribution and possession against defendant Hatcher and defendant Manetas. Under the government's broad view of joinder, the Hatcher facts would have been appropriate for joinder because the offenses were similar.
 
 
 50
 Counts 149 and 150 would have been closely related to the other counts if they involved the SSMC drug conspiracy. However, there was no link between the drug conspiracy charges and the charges against McAlpin in counts 149 and 150. Therefore, the failure of the trial court to grant the motion for severance as to counts 149 and 150 was an error of law.
 
 
 51
 Nevertheless, the improper joinder in this case does not require setting aside the convictions of Maurer and Baise. In Lane, the Court concluded that an improper joinder was harmless error because of the following: (1) there was overwhelming evidence of guilt; (2) the district court instructed the jury to consider each count and each defendant separately; and (3) the evidence regarding the misjoined counts would have been admissible under Federal Rule of Evidence 404(b) even if the counts had been severed. 474 U.S. at 450. Lane does not require that all three grounds above be present to find harmless error. Id.
 
 
 52
 In this case, there was overwhelming evidence of the guilt of Maurer and Baise. The court also gave several limiting instructions during the trial as well as a final instruction that the jury should not consider the evidence against any other defendants. Finally, the evidence would have probably been admissible under Rule 404(b) in a trial without counts 149 and 150 to show the intent of McAlpin. Therefore, any misjoinder under Fed.R.Crim.P. 8(b) in this case was harmless.[12]
 
 E. Recusal of the trial judge
 
 53
 Baise and Maurer argue that Judge Hackett erred in failing to recuse herself on the motion of defendants. A trial judge's denial of a motion to recuse will not be reversed unless there is an abuse of discretion. Kahn v. Yusufji (In re M. Ibrahim Khan), 751 F.2d 162, 165 (6th Cir.1984).
 
 
 54
 Baise and Maurer state two grounds for which Judge Hackett should have recused herself. First, she had previous contact with a government witness, James Stewart.[13] Second, she told defendants that if they did not plead guilty, they would not have the chance to obtain two points for acceptance of responsibility under the sentencing guidelines. Defendants contend that statement was violative of Fed.R.Crim.P. 11(e)(1), which forbids courts to participate in plea bargain discussions. As Judge Hackett did not grant a two-point reduction in sentencing, defendants allege that her actions were contrary to an "appearance of justice."
 
 
 55
 The court properly denied defendants' motion to recuse.[14] There was no reasonable factual basis for doubting her impartiality. See Kahn, 751 F.2d at 164. Further, there was no personal prejudice or bias sufficient to justify recusal. In order to justify recusal for alleged bias, the source of such bias must be "extrajudicial" or personal. Id.; see also United States v. Sammons, 918 F.2d 592, 598-99 (6th Cir.1990). Finally, Judge Hackett's comments concerning sentencing were sufficiently explained as efforts to manage her docket in this lengthy litigation.
 
 
 56
 F. The proper standard of care for pharmacists
 
 
 57
 McAlpin, Najor, Baise and Maurer claim reversible error in the instructions given by the trial court to the jury on the appropriate standard of care of pharmacists. Baise, Maurer and Najor further allege the court's limit on cross-examination of government witness Eddie Boyd concerning Michigan law on the standard of care of pharmacists was a denial of their right to defend themselves with information concerning Michigan law on the duty of care of pharmacists.[15]
 
 
 58
 "Jury instructions are reviewed as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." Beard v. Norwegian Caribbean Lines, 900 F.2d 71, 72 (6th Cir.1990). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law."[16] Bowman v. Koch Transfer Co., 862 F.2d 1257, 1263 (6th Cir.1988). The rule regarding requested instructions " 'is that the court is not bound to give instructions in either the form or the language in which they are requested, so long as the substance of the requested charge, which is supported by the evidence, is contained in the given charge.' " Gafford v. General Elec. Co., 997 F.2d 150, 166 (6th Cir.1993) (quoting Coursey v. Morgan Driveway, Inc., 366 F.2d 504, 508 (6th Cir.1966)).
 
 
 59
 The defendants' problem with the jury instruction is that the court did not use their requested instruction which allegedly reflected the appropriate standard of conduct for pharmacists under Michigan law.[17] All of the pharmacist defendants allege the trial court erred in failing to instruct the jurors regarding Michigan law from Adkins v. Mong, 425 N.W.2d 151 (Mich.App.1988). Adkins, argue the defendants, clearly shows that pharmacists in Michigan have no duty to second-guess valid prescriptions from physicians. They also argue that without their requested instruction the jury may have convicted them for failing to screen the patients for drug addiction which is not required by Michigan law.
 
 
 60
 The instructions given by the trial court concerning the duty owed by pharmacists correctly reflected the law regarding the standard of conduct for pharmacists consistent with 21 C.F.R. Sec. 1306.04 and United States v. Moore, 423 U.S. 122, 140 (1975). The instructions made clear that pharmacist defendants could only be held liable if they knowingly filled a prescription that was issued outside the course of professional practice. Defendants' claims are without merit. Taken as a whole, the instructions did not mislead or give the jury an inadequate understanding of the law. See Bowman, 862 F.2d at 1263. Therefore, the defendants are not entitled to a new trial based on alleged deficiencies in the jury instructions.[18]
 
 
 61
 Defendants challenge the court's limits on cross-examination of witness Boyd. A district court's evidentiary rulings will not be reversed absent a clear showing of abuse of discretion. United States v. Moreno, 933 F.2d 362, 375 (6th Cir.), cert. denied, 112 S.Ct. 265 (1991); United States v. Hickey, 917 F.2d 901, 904 (6th Cir.1990). A trial court may limit the cross-examination of a witness. United States v. Brown, 946 F.2d 1191, 1195 (6th Cir.1991). "[T]he Sixth Amendment has not been construed to give criminal defendants absolute control over cross-examination." Dorsey v. Parke, 872 F.2d 163, 166 (6th Cir.), cert. denied, 493 U.S. 831 (1989). "[E]ven when the core values of the Sixth Amendment are invaded by a denial of cross-examination, ... the standard of review is abuse of discretion, abuse being found where the trial court has interfered with the defendant's constitutional right." Id. (citations omitted). A trial court has broader discretion when merely the extent of cross-examination is limited. Id. at 167. When the cross-examination of the "star" government witness is curtailed, a trial court's ruling must be more carefully scrutinized, but the test remains whether the jury had enough information to assess the defense theory. Id. at 166-67.
 
 
 62
 Boyd testified as a pharmacist expert on behalf of the government. He opined that pharmacists are not allowed to fill every prescription issued by a licensed physician and that they must screen their patients for "drug-seeking" behaviors. Defendants complain because the trial court did not allow them to cross-examine Boyd concerning his knowledge of Adkins v. Mong, 425 N.W.2d 151.
 
 
 63
 The trial court did allow the defendants substantial cross-examination of Boyd. Boyd was not a lawyer. The trial court precluded examination on Michigan law on the rationale that it was the court's duty to instruct on the law. Defendants chose not to call their own pharmacist expert to rebut Boyd. The trial court's limit on cross-examination was within its broad discretion. See Dorsey, 872 F.2d at 166. While Boyd was one of the principal witnesses for the government, the limit on his cross-examination did not deny the jury enough information to assess the defendants' theory of the case. Id. As indicated above, the instructions to the jury on the standard of care owed by pharmacists were appropriate.
 
 
 64
 G. Admission of other crimes, wrongs, or acts evidence
 
 
 65
 McAlpin and Najor claim the district court erred in admitting acts of similar uncharged conduct relating to other incidents of drug distribution through government witnesses James Stewart, David Carlson, William Brantley and Gary McClenic.[19] The evidence was admitted pursuant to Federal Rule of Evidence 404(b).[20]
 
 
 66
 A district court's admission of evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard.[21] United States v. Robison, 904 F.2d 365, 368 (6th Cir.), cert. denied, 498 U.S. 946 (1990). The trial judge is accorded broad discretion in determining the admissibility of bad acts under Rule 404(b). United States v. Acosta-Cazares, 878 F.2d 945, 948 (6th Cir.), cert. denied, 493 U.S. 899 (1989). Admission of evidence under Rule 404(b) requires a two-part analysis:
 
 
 67
 The court must decide whether the evidence would serve a permissible purpose such as one of those listed in the second sentence of Rule 404(b). If so, the court must consider whether the probative value of the evidence is outweighed by its prejudicial effect.
 
 
 68
 Id. at 948-49 (internal quotations omitted); Robison, 904 F.2d at 368.
 
 
 69
 McAlpin and Najor argue the testimony was wrongfully admitted because it was not similar to the charged conduct, its probative value was outweighed by its prejudicial effect, it was really admitted as improper propensity and character evidence, and the trial court failed to balance the probative value of the testimony against its prejudicial effect.
 
 
 70
 The government claims the testimony was properly admitted because it showed evidence of knowledge and intent on the part of defendants, which was essential to the government's proof. The government also argues that the probative value of the evidence clearly outweighs its prejudicial effect, especially in light of the court's limiting instruction which was given before the testimony of each of the subject witnesses and after the close of the proofs. Taking into consideration the fact that the evidence was essential to the government's case as it dealt with an element of proof, the trial court concluded that its probative value was not substantially outweighed by the danger of unfair prejudice or confusion.
 
 
 71
 In United States v. Benton, 852 F.2d 1456, 1467-68 (6th Cir.), cert. denied, 488 U.S. 993 (1988), this court held that "where evidence of prior bad acts is admitted for the purpose of showing intent, the prior acts need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference of criminal intent." Id. at 1468. Benton, coupled with the broad discretion given to the trial court concerning Rule 404(b) issues, leads to the conclusion that the trial court properly decided to admit the Rule 404(b) evidence.
 
 
 72
 H. Evidentiary rulings concerning expert testimony
 
 
 73
 Dr. Morrell, Baise and Maurer claim reversible errors occurred during the testimony of government expert witness Dr. Peter Fragatos. Maurer and Baise claim that it was prosecutorial misconduct for the government to elicit from Fragatos on direct examination his prejudicial opinion that a similar type of clinic-pharmacy scheme was clearly a crime.[22] Dr. Morrell's claims all relate to the trial court's limit on the cross-examination of Fragatos concerning bias, prejudice or credibility.
 
 
 74
 A criminal defendant is guaranteed the right to cross-examine and confront witnesses against him under the Sixth Amendment. Stevens v. Bordenkircher, 746 F.2d 342, 346 (6th Cir.1984). Therefore, a criminal defendant may not be prevented from "exploring a witness' bias, prejudice, or motive for testifying." Id. However, a trial court may limit the scope of cross-examination. Id. The standard of review when a trial court limits cross-examination is abuse of discretion. Dorsey, 872 F.2d at 166.
 
 
 75
 In determining whether a trial court has abused its discretion in allowing only limited cross-examination as to motive, bias, or prejudice, a reviewing court must decide whether the jury was otherwise in possession of sufficient information concerning the formative events to make a discriminating appraisal of a witness' motives and bias.
 
 
 76
 Stevens, 746 F.2d at 346-47 (internal quotations omitted). If the reviewing court decides the trial court's abuse of discretion has violated the Confrontation Clause, the court must then decide "whether the constitutional error is harmless beyond a reasonable doubt." Id.
 
 
 77
 Dr. Fragatos testified concerning taped telephone conversations and in-person conversations with Dr. Morrell and Roquemore, which were made by Fragatos under the direction of DEA agents. After direct examination was completed, Dr. Fragatos obtained the court's permission to interrupt his testimony to fly to Montreal. He falsely stated his father had suffered a heart attack and was in the hospital. This excuse was not presented before the jury. The trial court refused to allow the defendants to cross-examine Dr. Fragatos when he returned concerning his absence and false excuse to the court. The decision was based, inter alia, on the following: the issue was collateral, the false statement came after direct examination was complete, and the jury needed to focus on the defendants rather than Dr. Fragatos.
 
 
 78
 The court also denied the admission of a proposed exhibit sought to be admitted by Dr. Morrell. The exhibit was a witness list showing that in a civil malpractice case against Dr. Fragatos, Dr. Morrell was listed as a proposed witness for the plaintiff. Although Dr. Morrell was permitted to question Dr. Fragatos concerning his knowledge of Dr. Morrell's role in the prior case, Dr. Fragatos denied knowing that Dr. Morrell was a proposed witness against him. Dr. Morrell argues the trial court's rulings on this issue constituted a denial of his right to confrontation and a denial of his right to impeach a witness under Federal Rules of Evidence 607 and 608(b).
 
 
 79
 The court's ruling concerning the proposed exhibit was not an abuse of discretion. Dr. Morrell was allowed to cross-examine Dr. Fragatos concerning his knowledge that Dr. Morrell was listed as a witness against him in a former case. Further, the jury was made aware of the exhibit and its contents during cross-examination. Thus, the jury was able to make a "discriminating appraisal" of the witness' motives and bias. See Stevens, 746 F.2d at 347.
 
 
 80
 The ruling concerning Dr. Fragatos' false statement to the court is more problematic. Defendants were not allowed to cross-examine the witness at all on this issue. Nevertheless, Dr. Fragatos' false statement was a collateral issue. Further, the false statement did not involve the three areas of primary concern in Stevens: prejudice, bias and motive. Id. Hence, there was no abuse of discretion in this case.
 
 
 81
 I. Prosecutorial misconduct regarding AIDS testimony
 
 
 82
 At trial, the government questioned Michael Fernandez, a patient at SSMC from 1982 through 1987 or 1988, concerning his level of medical treatment at SSMC. Fernandez testified that after feeling ill for over a year, in April 1987 he went to the VA hospital where he was immediately tested and diagnosed as having AIDS. The government further elicited from Fernandez that despite obvious AIDS symptoms for one to two years, and despite the fact that he was given comprehensive blood tests, SSMC failed to test for or discover his AIDS.
 
 
 83
 Roquemore, Maurer and Baise argue that the statements elicited from Fernandez constituted prosecutorial misconduct and denied them the right to a fair trial. Maurer and Baise argue the government presented the AIDS testimony without knowing whether AIDS testing was available prior to 1987 and without knowing the standard of care for physicians when testing for AIDS.
 
 
 84
 The government argues the evidence was relevant to show that SSMC failed to order medically necessary tests. Further, the government contends it had a good faith basis for raising the AIDS testing issue because government expert witness Dr. Berger indicated AIDS tests were available prior to 1987 and should have been ordered on Fernandez, given his symptoms.
 
 
 85
 Concluding that AIDS testing was not widespread practice prior to 1988, the trial judge instructed the jury that the defendants were not being charged in any way connected to Fernandez's AIDS; the medical profession had not developed a standard of care, or reliable test, for testing AIDS when Fernandez was treated at SSMC; and Fernandez's opinion as to when AIDS blood testing should have been conducted was not entitled to any weight and should be disregarded.
 
 
 86
 Even if the government's conduct was inappropriate in this case, such conduct was not reversible error because the resulting prejudice, if any, did not permeate the entire trial. See United States v. Castro, 908 F.2d 85, 89 (6th Cir.1990); United States v. Krebs, 788 F.2d 1166, 1177 (6th Cir.), cert. denied, 479 U.S. 930 (1986). Prosecutorial misconduct will not give rise to reversible error "if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury." United States v. Bess, 593 F.2d 749, 757 (6th Cir.1979). In this case, any prejudicial effect of improper conduct was negated by the court's instruction. See United States v. Thomas, 728 F.2d 313, 320 (6th Cir.1984).
 
 
 87
 J. Admission of federal income tax return evidence
 
 
 88
 Roquemore, Maurer and Baise argue that the trial court committed reversible error in admitting tax return information concerning income derived from SSMC, Selden Drugs Pharmacy and University Village Pharmacy.[23] Defendants claim the financial information was not relevant under Federal Rule of Evidence 402 and that its probative value was substantially outweighed by the danger of unfair prejudice under Rule 403.
 
 
 89
 Trial courts have broad discretion in determining whether to admit evidence based on considerations of relevance and materiality. United States v. Carter, 969 F.2d 197, 200 (6th Cir.1992). A district court's decision to admit evidence based on considerations of relevance and materiality will be reversed only if the district court abuses its discretion. Id.
 
 
 90
 In Carter, the court stated that the "district court abused its discretion by allowing the government to use a plethora of irrelevant financial information." Carter, 969 F.2d at 200. The court also noted it was "most troubled" by the government's use of tax returns in a narcotics case as tax fraud was not at issue. Id. Finally, the "bad" evidence admitted in Carter came before the court by the government's use of a "series" of witnesses. Id. at 199.
 
 
 91
 In this case, the questioned financial information was simply admitted by the use of exhibits, not by a series of witnesses. No tax returns were admitted into evidence. Finally, the government offered a legitimate reason for admitting the evidence--it was relevant to show financial stake or motive in the RICO-enterprise. From these facts, it is evident Carter is not controlling in this case.
 
 
 92
 The trial court did not abuse its discretion. Relevancy questions depend upon the exercise of considerable judgment; thus appellate courts should not "lightly overrule the trial court's decision." United States v. Stull, 743 F.2d 439, 445 (6th Cir.1984), cert. denied, 470 U.S. 1062 (1985). Even if the trial court's decision to admit the financial information was an abuse of discretion, defendants have failed to show the error was not harmless. See Carter, 969 F.2d at 201. An error not affecting substantial rights should be disregarded. Fed.R.Crim.P. 52(a).
 
 K. Foundation for expert testimony
 
 93
 Government expert witness Dr. Berger testified that the eighteen target patient charts named in the indictment were representative of the other patient charts at SSMC. The basis for his opinion was his detailed review of thirty-three of the 4,500 patient charts. He chose the thirty-three charts by reviewing one box of charts from the beginning of the alphabetized charts, one from the middle and one from the end. He also perused through charts in fifteen or sixteen other boxes. Dr. Berger provided no authority for his statistical research method.
 
 
 94
 Dr. Morrell argues that: (1) Dr. Berger's methods, concerning the gathering of statistical data to testify about representatives of a patient population, were not reliable or helpful to the jury as required by Federal Rule of Evidence 702; (2) Dr. Berger's data was not reliable or authentic as required by Rule 703 and Rule 901; and (3) Dr. Berger's opinion testimony created unfair prejudice.
 
 
 95
 The admissibility of expert testimony is governed by Federal Rule of Evidence 702. "For expert testimony to be admissible under Rule 702, a four-part test must be met: (1) a qualified expert; (2) testifying on a proper subject; (3) in conformity to a generally accepted explanatory theory; (4) the probative value of which outweighs any prejudicial effect." United States v. Kozminski, 821 F.2d 1186, 1194 (6th Cir.1987) (en banc), rev'd in part on other grounds, 487 U.S. 931, 936 n. 2 (1988) (stating that the Court was not addressing the issue of the admissibility of expert testimony under Rule 702).
 
 
 96
 Dr. Berger's testimony does not meet the third prong of the above test. The government did not lay a proper foundation under this element. See id. at 1194-95. Moreover, Dr. Berger testified that he chose not to use a scientific approach. Therefore, Dr. Berger's testimony should have been excluded. However, the alleged error was not reversible error because it did not affect substantial rights. Fed.R.Crim.P. 52(a). The error did not have a substantial influence on the verdict and was not inconsistent with substantial justice; therefore, no reversible error is present. See Kotteakos v. United States, 328 U.S. 750, 756 (1946); TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 550 (6th Cir.1981).
 
 L. Sentencing
 
 97
 Dr. Morrell, Dr. Sims-Robertson, Roquemore, Baise and Maurer argue that the trial court erred in sentencing. Dr. Sims-Robertson was sentenced to concurrent terms of twelve years, five years, and two years pursuant to 18 U.S.C. Sec. 4205(b)(2), which made her eligible for parole at such time as the Parole Commission may determine. She claims she should be resentenced because the trial court erroneously thought she would be eligible for parole after serving one-third of her sentence.
 
 
 98
 The Parole Commission has the sole authority to determine when a defendant is paroled. United States v. Addonizio, 442 U.S. 178, 189 n. 15 (1979). However, a trial court may set a "defendant's eligibility for parole at any point up to one-third of the maximum sentence imposed...." Id. (citing 18 U.S.C. Sec. 4205(a), (b)).
 
 
 99
 The court gave Dr. Sims-Robertson a break by leaving the issue of when the defendant would be paroled to the Parole Commission. The Parole Commission later set her parole eligibility at 100 plus months. Her sentence is proper in this case, as it was within the legal limits and not subject to guidelines.
 
 
 100
 Roquemore argues the trial court erred in applying the guidelines in several ways. First, Roquemore claims he should have been sentenced according to pre-guideline law because the RICO conspiracy ended prior to November 1, 1987. This argument is without merit. The conspiracy continued past 1987. Roquemore also failed to show any affirmative act on his part to withdraw from the conspiracy prior to November 1, 1987, which would have precluded application of the guidelines. United States v. Chambers, 944 F.2d 1253, 1269 (6th Cir.1991), cert. denied, 112 S.Ct. 1217, and cert. denied, 112 S.Ct. 1680 (1992).
 
 
 101
 Second, he and Dr. Morrell argue the court erred in determining the base level as twenty for Count III, conspiracy to distribute schedule III and IV controlled substances. They claim the trial court should not have considered all controlled substances prescribed by SSMC as relevant conduct. The conduct considered by the trial court met the preponderance of evidence standard and the trial court did not err as a matter of law. See Robison, 904 F.2d at 370.
 
 
 102
 Third, Roquemore claims the court erred in increasing his base level for the drug-related count by two under the "vulnerable victim" part of U.S.S.G. Sec. 3A1.1. The trial court determined that SSMC patients were vulnerable victims. This factual determination was not clearly erroneous; hence, it may not be reversed by this court. United States v. Pavao, 948 F.2d 74, 78-79 (1st Cir.1991). Further, the trial court did not make an error of law in applying the victim-related adjustments under the guidelines. United States v. Caterino, 957 F.2d 681, 683 (9th Cir.1992).
 
 
 103
 Fourth, he claims the court erred in two ways in determining the mail fraud counts: (1) the loss was grossly inflated, and (2) he should not have received increases in the base offense level for both his aggravating role in the offense, and the degree of planning involved. The trial court imposed a four-level increase under U.S.S.G. Sec. 3B.1(a) for being the organizer of at least five persons, and a two-level increase under U.S.S.G. Sec. 2F1.1(b)(3)(a) for "more than minimal planning." The government argues Roquemore has waived this issue by failing to timely object. See United States v. Nagi, 947 F.2d 211 (6th Cir.1991), cert. denied, 112 S.Ct. 2309 (1992). However, the record indicates that Roquemore did timely object by joining the objections made by Dr. Morrell on this issue in the district court. The same conduct should not be used to enhance a defendant's sentence under two separate provisions of the guidelines. United States v. Romano, 970 F.2d 164, 167 (6th Cir.1992). The trial court's sentence of Roquemore on this issue is vacated and remanded for the court to resentence Roquemore after considering the applicability of Romano.
 
 
 104
 Fifth, he and Dr. Morrell argue the trial court erred in increasing the combined base offense level two points pursuant to U.S.S.G. Sec. 3D1.2 by grouping the violations of controlled substances laws together and by grouping the various fraud offenses into a single group separate from the drug offenses. Where distinct societal interests are infringed by conduct in different counts they should not be grouped together, even if they are generally considered part of a common plan or scheme. See United States v. Egson, 897 F.2d 353 (8th Cir.1990) (holding that grouping was inappropriate for counts of illegal food stamp acquisition and cocaine distribution, even though defendant arranged for the exchange of cocaine for food stamps). The trial court did not err by finding two separate groups as the fraud offenses and controlled substance offenses, although part of a common plan, did not involve substantially the same harm.
 
 
 105
 Sixth, Roquemore argues the trial court erred in granting an upward departure in sentencing. Roquemore's sentence was a twenty-three month upward departure from the guidelines. An upward departure is appropriate if the circumstances of the case are sufficiently unusual. United States v. Phillip, 948 F.2d 241, 253 (6th Cir.1991), cert. denied, 112 S.Ct. 1994 (1992). The trial court's upward departure in sentencing was factually supported and reasonable and will not be reversed as there is no "clear error." United States v. Rodriquez, 882 F.2d 1059, 1067 (6th Cir.1989), cert. denied, 493 U.S. 1084 (1990).
 
 
 106
 Dr. Morrell argues the trial court erred in sentencing him because the court considered the past acts of co-conspirators as relevant conduct. He argues the past acts of co-conspirators should not be considered "reasonably foreseeable" or "within the scope of the conspiracy." U.S.S.G. Sec. 1B1.3. If a defendant shows commitment toward achieving a conspiracy's goals, then he should be subject to the consequences of the acts of co-conspirators before he joined the conspiracy. See United States v. Centracchio, 977 F.2d 1061, 1066 (7th Cir.1992). There was sufficient evidence in this case to conclude Dr. Morrell was committed to the goals of the conspiracy. Therefore, it was not an error of law for the court to consider past acts of co-conspirators as relevant conduct in sentencing Dr. Morrell.
 
 
 107
 Maurer and Baise argue that the trial court erred by failing to individualize their sentences, by relying on inapplicable sentencing guidelines, and by miscalculating the amount of opiate drugs applicable to them under the sentencing guidelines. Their primary complaint is that it was impermissible for the trial court to try to equalize the sentences of those defendants sentenced under the sentencing guidelines with those sentenced under the pre-guideline laws.
 
 
 108
 The sentences of Maurer and Baise were within the statutory limits applicable to them. The trial court's decision to attempt to equalize the pre-guideline and guideline sentences was not unfair to Maurer and Baise. A sentencing decision by a district court within the statutory limits is generally unreviewable. United States v. Johnson, 831 F.2d 124, 129 (6th Cir.1987), cert. denied, 485 U.S. 968 (1988). Moreover, a review of the sentences in this case would be of no avail as Maurer and Baise have failed to "demonstrate the gross abuse of discretion on the part of the sentencing judge which would necessitate a reversal of the sentencing order." Id.
 
 III. Conclusion
 
 109
 After reviewing all of the issues raised by defendants in this appeal, this court concludes that the defendants were properly convicted in the district court. As to their sentences, all of the defendants were properly sentenced except Roquemore. Roquemore's sentence is vacated and remanded to the district court to determine the applicability of United States v. Romano, 970 F.2d 164. Accordingly, the judgment of the United States District Court for the Eastern District of Michigan is AFFIRMED in part and VACATED and REMANDED in part.
 
 
 
 *
 Honorable James L. Oakes, Senior United States Circuit Judge for the Court of Appeals for the Second Circuit, sitting by designation
 
 
 [1]
 31 C.F.R. Sec. 1306.04 provides in relevant part: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."
 
 
 [2]
 Although this circuit has not addressed this issue directly, it has indicated that when proving RICO enterprise "[t]here is no requirement ... that all conspirators be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated in any way; all that is necessary is that the acts are connected to the affairs of the enterprise." United States v. Qaoud, 777 F.2d 1105, 1116 (6th Cir.1985), cert. denied, 475 U.S. 1098 (1986)
 
 
 [3]
 Hughes involves a fact scenario very similar to the case at hand. In Hughes, a disreputable medical clinic defrauded Medicaid and Blue Cross Blue Shield through a scheme involving fraudulent blood testing and illegal distribution of controlled substances. The patients, drug addicts, who frequented the clinic were attended by physician's assistants. Under the clinic's policy, four tubes of blood were drawn from each patient. If patients refused to give blood, they were denied controlled substances. Through the use of cooperating pharmacies and kickbacks, the clinic made profits. Hughes, 895 F.2d at 1138-39
 
 
 [4]
 18 U.S.C. Sec. 1961(1) broadly defines "racketeering activity" to include a wide variety of state and federal crimes. Included in the list are mail fraud and dealing in narcotic or dangerous drugs when punishable under any law of the United States
 
 
 [5]
 Stewart notified DEA agents and stated at trial that his grand jury testimony was false. Brantley testified at trial that his grand jury testimony was false
 
 
 [6]
 Count III charged the defendants with conspiring to unlawfully distribute schedule II, III and IV controlled substances
 
 
 [7]
 A constructive amendment is present "when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. Hathaway, 798 F.2d 902, 910 (6th Cir.1986)
 
 
 [8]
 Najor also raises anew in his reply brief a claim that the court abused its discretion, and prejudiced him, by denying defendants' motion to sever counts from the indictment. Likewise, this court will not consider this newly-raised argument. Wright, 794 F.2d at 1156
 
 
 [9]
 Maurer and Baise make a broader claim of misjoinder. In essence, their claim is that they should have had a separate trial from all, or at least most, of the other defendants because their acts were not related to the acts of the others. Counts 149 and 150 are the only charges arguably involving unrelated conduct; therefore, they are the only counts this court will address
 
 
 [10]
 Rule 8(b) provides that:
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 Rule 14 permits the trial court to order or grant whatever relief is necessary "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together."
 
 
 [11]
 This testimony admitted under Federal Rule of Evidence 404(b) dealt with alleged "street sales" of drugs by McAlpin and his dealers. The drug sales were not related to SSMC and did not involve allegations of fraudulent use of prescriptions. The testimony concerning this alleged unrelated conduct lasted nearly one week
 
 
 [12]
 As the misjoinder was harmless error in this case under Rule 8(b), any abuse of discretion under Fed.R.Crim.P. 14 was also harmless
 
 
 [13]
 Stewart pled guilty before Judge Hackett and received probation. Also, Stewart, after violating his probation, was brought back before Judge Hackett and sentenced to two years imprisonment
 
 
 [14]
 Chief Judge Julian Cook, Jr., denied the motion to recuse. Judge Cook ruled the trial judge sufficiently explained her comments concerning sentencing when she indicated her intent was not to coerce or persuade, but rather to satisfy her calendar and docket management obligations. Further, Judge Cook ruled the trial judge's former sentencing of witness Stewart did not infringe upon the appearance of impartiality
 
 
 [15]
 McAlpin raises the cross-examination issue in his reply brief only. As he did not raise this issue in his original brief, this court will not consider it as to him. See Wright v. Holbrook, 794 F.2d at 1156
 
 
 [16]
 Najor asks this court to apply the standard of review found in Sandstrom v. Montana, 442 U.S. 510, 514 (1979). Under Sandstrom, a jury instruction is reversible if a reasonable jury could have interpreted the instruction as unconstitutionally shifting the burden of proof. 442 U.S. at 514. This is an "outdated standard." O'Neal v. Morris, 3 F.3d 143, 145 (6th Cir.1993). The current standard applied by the Supreme Court is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.' " Id. (quoting Estelle v. McGuire, 112 S.Ct. 475, 482 & n. 4 (1991)) (internal quotations omitted)
 
 
 [17]
 An Amicus Curiae brief was filed in this case by the Michigan Pharmacists Association ("MPA"). MPA is concerned that the jury instructions may have improperly blended the duties and responsibilities of pharmacists and physicians. It asks the court to use this case to make clear the standard of conduct expected of pharmacists in cases of alleged illegal distribution of controlled substances. The MPA's concern is unwarranted as the instructions fairly distinguished between the duties of physicians and pharmacists. Further, even the MPA's preferred source for defining proper professional behavior for pharmacists, The Pharmacist's Manual (Revised April 1986), quotes 21 C.F.R. Sec. 1306.04 as providing the appropriate standard of care. Id. at 31
 
 
 [18]
 Baise and Maurer also argue that 21 C.F.R. Sec. 1306.04 is ambiguous and unconstitutionally vague. This argument is without merit as it is contrary to United States v. DeBoer, 966 F.2d 1066, 1068-69 (6th Cir.1992)
 
 
 [19]
 Dr. Sims-Robertson argues that this evidence was improperly admitted because it was irrelevant and prejudicial to her. She has failed to show actual prejudice to her case. Further, introduction of evidence that is inflammatory to one defendant, but not related to other defendants, fails to establish prejudice to the co-defendant. United States v. Frost, 914 F.2d 756, 764 (6th Cir.1990)
 
 
 [20]
 At the time of the trial, Fed.R.Evid. 404(b) provided:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [21]
 More precisely, the trial court's balancing of the probative value of other acts evidence against its prejudicial effect is reviewed under the abuse of discretion standard. The initial determination under Rule 404(b) that the other act is probative of a material issue other than character or criminal propensity is reviewed under a de novo standard. United States v. Fountain, 2 F.3d 656, 667 (6th Cir.), cert. denied, 62 U.S.L.W. 3393 (1993)
 
 
 [22]
 This argument holds no merit. Maurer cites no precedent specifically supporting his claim of prosecutorial misconduct under the facts of this case
 
 
 [23]
 Maurer and Baise frame their argument as denial of their right to a fair trial based on prosecutorial misconduct. There is no evidence that the government acted inappropriately in presenting the financial information. As the trial court admitted the questioned evidence, the correct issue is whether such ruling was an abuse of discretion. See United States v. Carter, 969 F.2d 197, 200 (6th Cir.1992)